**ISCHAR et al. v. WEST TEXAS UTILITIES CO.**

No. 7799.

Court of Civil Appeals of Texas. Austin.
Nov. 23, 1932.

Rehearing Denied Dec. 14, 1932.

Frank C. Dickey, of Ballinger, and Scarborough, Ely & King, of Abilene, for appellants.

Davidson, Doss & McMahon and Wagstaff, Harwell, Wagstaff & Douthit, all of Abilene, and King, Wood & Morrow and H. E. Cox, all of Houston, for appellee.

McCLENDON, C. J.

July 2, 1931, E. A. Ischar while attempting to operate an electric drill in his blacksmith shop at Ballinger, was killed by an electric current (the motive power of the drill), which was brought into the shop through the service wires of the West Texas Utilities Company. This suit was brought against the latter, for compensatory damages for Ischar's death, by his mother, widow, and children, who have appealed from an adverse judgment upon a special issue verdict.

The drill which was connected with the light circuit, carrying normally from 110 to 125 volts (commonly called a 110-volt current) was defective in that there was a "short" in its wiring which resulted at times in the user's receiving a shock. The suit was predicated upon the hypothesis that the voltage of the current which killed Ischar was largely in excess of the normal, due to the utilities company's negligence. The jury found that the current which killed Ischar was not in excess of the usual and normal.

The only evidence of an excessive voltage was the physical effect of the current in producing Ischar's death and two burns upon his body, and in causing severe shocks to two other persons who came in contact with his body before the current was cut off. It was the theory of appellants that these results could not have been produced by the normal voltage under the conditions in evidence.

The appeal presents but two rulings of the trial court for review. These relate to the exclusion of the following evidence offered by appellants: (1) The rules of the utilities company furnished its employees for their guidance in guarding against injury while dealing with charged electric wires; and (2) evidence to the effect that appellee sold for use in private residences cook stoves operated with a three-phase current of 220 to 235 volts (commonly called 220 volts).

We overrule assignments complaining of excluding the latter evidence on two grounds: (1) We think the evidence was entirely void of any probative force. (2) There was other evidence in the record to the effect that cook stoves requiring the 220-volt three-phase circuit were in common use in private families, and that motors requiring the same voltage were in common use in small industrial plants. There was in fact no controversy in this regard. Whatever inferences might, therefore, be properly drawn from the excluded evidence were as readily deducible from other uncontroverted evidence before the jury. The trial court's ruling in this regard was therefore harmless.

The rules were offered as tending to prove by way of admission that the 110-volt current would not produce death, and in impeachment of appellee's witnesses who testified to the contrary.

Those portions of the rules offered and excluded follow:

"Rules for the Safety of Employees.

"Sec. 240. Special Rules for Live Line Maintenance.

"(a) All live wires or apparatus having a voltage of 5,000 or less may be handled or worked on while energized, but such wires or apparatus carrying a voltage between 300 and 5,000 Alternating Current shall not be touched or worked on without wearing rubber gloves and using all other protective devices necessary for safety. Lines or apparatus carrying a voltage in excess of 250 volts Direct Current shall not be worked on without the use of protective devices, except when the work can be done without danger of contact with ground or other line. * * *

"Section 192. Protective Devices.

"(a) The company supplies rubber gloves for all work requiring them. It is positively required that all live wires or apparatus carrying a voltage between 300 and 5,000 volts between phases be handled with rubber gloves." * * *

"195. Handling Fuses or Brushes:

"In handling fuses on circuits of more than 300 volts employees shall use rubber gloves and insulated rods or tongs and where provided stand on insulated platforms or mats. The body shall be kept as distant and as far below apparatus being worked upon as possible. Brushes on live equipment shall be handled only when necessary and then with due precautions. All fuse boxes or other fuse receptacles shall be properly fused at all times, (no open fuse or copper links will be

permitted). Before replacing fuses on circuits above 300 volts the circuit shall be disconnected, or the fuse shall be handled by insulated tools, rubber gloves or portable apparatus which should be provided. Insulated tongs shall be used for handling all live potential transformer fuses of 2,000 volts and over." * * *

"(c) 181. For protection to the operator where parts of more than 300 volts to ground are not otherwise guarded or isolated by elevations, there shall be provided suitable insulating floors, mats or platforms with good footing and they shall be so placed that the operator cannot readily touch live parts, unless standing on such mats or platforms. * * *

"216. (e) Ground wires and ground connections shall be inspected periodically, and ground connections on distribution systems shall, when installed, be tested for resistance unless multiple grounding to water piping is used and a permanent record of these tests kept. * * *"

The gist of appellee's counterproposition may be reduced to the following:

(1) The rules were at most only an opinion of appellee and were therefore not admissible against it.

(2) Not being the expression of any of the witnesses the rules could not be offered to impeach their testimony.

(3) The evidence conclusively shows that there was no excess current on the circuit.

(4) That Ischar met his death from a normal current is as reasonable an hypothesis from the evidence as that the current was abnormally excessive, and since there was no direct evidence of excessive voltage, a directed verdict for appellee would have been proper.

(5) Ischar was guilty of contributory negligence as a matter of law in using a drill which he knew to be defective.

The rules could only be admissible as primary evidence, upon the issue whether the 110-volt current was capable of producing death when directly applied under favorable circumstances. We agree with appellee that upon that issue they constituted only its opinion that such voltage would not produce death. The cases cited by appellee [Negociacion, etc., v. Love (Tex. Civ. App.) 220 S. W. 224; Williams v. Fuerstenberg (Tex. Civ. App.) 12 S.W.(2d) 812; Baker v. Keet Rountree Dry Goods Co., 318 Mo. 969, 2 S.W.(2d) 733, 3 S.W.(2d) 1003; Texas Employers' Ins. Ass'n v. Sewell (Tex. Civ. App.) 32 S.W.(2d) 262] are to the effect that a previous expression of opinion is not admissible as an admission against interest. In these cases, however, the fact in issue was of such character that proof of its existence rested in actual knowledge and not in the opinion of the witnesses. The evidence in this case shows that the fact here in issue (amount of voltage essential to produce death) was a matter entirely of expert opinion; and, as is often the case, the experts who testified were widely apart in their opinions upon this essential point.

The evidence showed the event to have occurred about 4 o'clock in the afternoon of a clear, dry, warm July day. Ischar had been constantly working in his shop, and was damp from perspiration. The evidence was conflicting whether the ground upon which he was standing was wet. There was evidence from interested sources that he had on rubber soled shoes considerably worn.

The evidence is without conflict that, except under favorable conditions, that is where the person exposed to the current is in contact with a good conductor which would complete the circuit either through the ground or other return medium, 110 volts would not produce death or serious bodily harm. Dry clothing and skin and dry ground on account of their nonconductivity would lessen or eliminate, whereas damp clothing and skin and damp ground would enhance the deleterious effect of the current. The real material conflict in the testimony was with reference to the effect of a shock where the latter condition prevailed. One expert medical witness testified, based upon his study, reading of authorities, and experience, that under favorable conditions the 110-volt current would not produce death. He was corroborated in this by a former employee of appellee. A number of experts, medical and electrical engineering, testified that voltage ranging as low as 40 or 46 would produce death where the conditions were favorable. To reach the conclusion it did the jury must have concluded that the conditions were favorable; that is that Ischar's clothing and body were damp from perspiration, that he was standing upon wet or damp ground, and the insulation provided by his rubber soles (if they accepted the testimony in that regard) was poor or defective. They also must have accepted the expert testimony of appellee's witnesses to the effect that, under these conditions, the 110-volt current would produce death. All of this expert testimony as to which there was a conflict, was opinion evidence.

Appellee was engaged in a business which dealt with a highly dangerous substance or force. Whether a substance or force (a matter upon which we understand the conclusions of science are still tentative) is immaterial here. Appellee is presumed to have acquainted itself with the effects of this phenomenon from the most advanced scientific sources. In issuing to its employees instructions for their safety, it would necessarily be guided by the scientific knowledge thus acquired, as well as by its own experience, and advise precautions which would guard against

all reasonable danger of injury. The rules were very specific in prescribing precautions for dealing with voltages of 250 in direct and of 300 in alternating currents; but suggested no precautions under any conditions for currents of lower voltages. The reasonable, if not in fact necessary inference to be drawn from these rules was that such latter voltages were not dangerous regardless of the attendant conditions. We think the rules constituted material primary evidence upon this vital issue, were admissible, and their exclusion error.

■ Appellee's second counterproposition above, we think well taken, but its importance is eliminated by our above holding.

■ Appellee's third counterproposition, above, is predicated upon the fact that the uncontradicted testimony shows that a current of approximately 300 volts, or even less where considerably in excess of 110 to 130 volts, would burn out all light globes on the circuit which were turned on at the time. Appellee contends that the testimony of three disinterested witnesses established the fact conclusively that such condition prevailed, and that, therefore, the possibility of a dangerously excessive current was excluded. We give in full the testimony of these witnesses as to their lights being turned on at the time.

J. L. Harding:

"Q. Now at that time, were you using the electricity in your shop? A. I am not sure about that.

"Q. Well, were you using the electric lights in your place of business that day? A. I could have been; sometimes I iron with the electric lights and sometimes without them.

"Q. Well, that day, the day of the accident, did you have the lights on that afternoon? A. Yes."

C. W. Jennings:

"Q. On the afternoon of that day * * * did you have any lights connected on in your shop? A. Yes sir.

"Q. Globes turned on? A. Yes sir."

E. E. King:

"Q. Did you have any electric light globes connected with the West Texas Utilities Company system in that store then? A. Yes sir."

Without in any way discrediting this testimony from the viewpoint of the integrity and disinterestedness of the witnesses, we think it falls short of establishing conclusively that at the very time of the occurrence their lights were turned on. The witnesses were testifying in December to matters transpiring early in the previous July. There was no especial reason why they should remember definitely whether the lights were burning at the particular time in question; and the opportunity for honest mistake was too great to bring the evidence within the rules which would characterize it in law as conclusive. It cannot be said that the evidence was wholly without contradiction or question, since to so hold would be to discredit the testimony of appellants' witnesses to the effect that Ischar's death could not have been produced by a 110-volt current.

■ Appellee's fourth counterproposition, above, rests upon its interpretation of the doctrine of res ipsa loquitur. At the outset it should be clearly held in mind that appellants relied upon this doctrine only to raise the prima facie presumption of negligence on appellee's part in permitting an excessive voltage upon the light circuit. The fact of the existence of such excessive voltage was sought to be established by circumstantial evidence, namely, that in order to effect the death of Ischar from an electric shock a voltage in excess of the usual (110 to 130) was essential. We think there is no question but that the burden resting upon appellants in this regard was fully met. It was not essential that the evidence upon this issue be conclusive or without contradiction. It was only essential that it be such that, if accepted by the jury as true, it excluded the usual voltage as a reasonable explanation of Ischar's death. We do not doubt the sufficiency of the evidence to support affirmatively a finding that Ischar met his death from a current of excessive voltage. This being the state of the evidence the doctrine of res ipsa loquitur would raise the rebuttable presumption of negligence on appellee's part in permitting the excessive voltage on the circuit.

The rebuttal evidence on this point was sufficient to raise a fact issue, but was not conclusive.

■ Ischar's contributory negligence, we think was clearly a fact issue and not one of law. Ischar knew the drill was defective, and that such defect would permit the operating current to pass through his body under otherwise favorable circumstances. He had been shocked before, but without serious consequences. We may concede that he was charged as a matter of law with knowledge of whatever danger was attendant upon using the drill with the usual current. If we assume, however, that such current would not produce death or serious bodily harm (which the evidence will support), whether an ordinarily prudent person would use the defective drill was, we think, a question of fact. See Gilbert v. Duluth G. E. Co., 93 Minn. 99, 100 N. W. 653, 106 Am. St. Rep. 430.

The trial court's judgment is reversed and the cause remanded.

BAUGH, J., not sitting.