**Daniel OZARK, Individually and As Next Friend for Dwain Ozark, a Minor, Appellant,**

v.

**WICHITA MANOR, Incorporated, and City of Wichita Falls, Texas, Appellees.**

**No. 16788.**

United States Court of Appeals Fifth Circuit.

Feb. 25, 1958.

Philip S. Kouri, Jack G. Banner, Wichita Falls, Tex. (Kouri & Banner, Wichita Falls, Tex., on the brief), for appellant.

Milburn E. Nutt, Harold Jones, J. Walter Friberg, Wichita Falls, Tex. (Jones, Parish & Fillmore, Wichita Falls, Tex., on the brief), for appellees.

Before JONES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The sole question here is whether the Court erred in not giving suitable instructions to the jury on the theory of res ipsa loquitur. Without such instructions the jury on a general charge returned a general verdict for the defendants.

Dwain Ozark, then six years old, sustained severe injuries including the total loss of an eye when a one-half gallon glass milk bottle exploded. The evidence was such as to permit the jury to conclude that the bottle exploded, and that this occurred when the little boy, after putting the open neck of the bottle over an outside water hydrant-faucet, opened the faucet from which air or water, or both, suddenly came under great and unusual pressure with sufficient violence to shatter the bottle and scatter it in small pieces over an area of fifteen feet.

Starting with this event of destruction of the bottle from excessive pressure, the plaintiffs proceeded to demonstrate through evidence which the jury could credit why each of the two defendants [1]

---

1. The suit was jointly against the City of Wichita Falls, Texas, and Wichita Manor, Inc., the owner and operator of this large apartment project comprising

had an actual and legal responsibility for the resulting injury.

In the rear of one of the apartment buildings and near the one containing the Ozarks' unit was a wash house with laundry facilities available for the tenants' use. Some time prior to July 6, 1954, the date of the accident, a leak had developed in a line running to or in the wash house. This line admittedly belonged to Manor. The City had a service line which ran from a principal water main in a nearby street and then through this apartment project. There were separate meters for each individual apartment unit. The service line up through each meter as well as the meters were the property of the City. The City had the responsibility for maintenance and repair of this service line and the meters even though located on Manor's premises. The line from the meter to and in each separate apartment was the property of Manor. It had the responsibility for upkeep, maintenance and repair of such facilities.

When Manor's employee, the apartment manager and general superintendent, attempted to repair the leak in Manor's line, he found that he could not cut off the water at the meter leading from the City's service line to the wash house. The cutoff valve in the City's meter was defective and would not close. Consequently, he called the City Water Department whose supervisory employee inspected the meter, found the valve stuck and out of order and arranged for laborers who would, and shortly did, replace the defective valve. This meter, of which the stop valve was a part, was in a meter box set in the ground. To do this job, it was necessary to dig around and then remove the meter box, discon-

nect the pipes on both sides of the meter, remove the defective valve, replace it with a sound one, reconnect the pipes to the meter, and put it back in the meter box.

Of course, before the meter could be disconnected, it was necessary to cut off the water supply to that meter. That was done by closing two valves. One was a master valve at the place where the service line tied onto the water main, and the other was a main valve in the City's service line on Manor's premises at a point beyond the defective meter. Notwithstanding both of these valves were tightly closed and would thus presumably hold the vacuum preventing the loss of any water, it was undisputed that when the meter was disconnected, there was a drainage of ten to fifteen gallons of water from this service line. It is this loss which was of likely critical significance from a mechanical standpoint.

When the stop valve was replaced and the meter reconnected, the two master valves were opened. But neither the City's employees nor Manor's superintendent, who was in close touch with all of these activities, made any effort whatsoever to "bleed" the line of air even though, with the drainage from this service line, there was a likelihood that air was present.

Expert witnesses, whose competence is not here challenged, appeared for both sides. From this testimony it appeared almost undisputed that pressure in the City's service line and in the adjacent one-inch line from meters to apartment outlets was about 70 to 75 psi. The City's expert did not undertake categorically or inferentially to dispute the main theme [2] of plaintiffs' expert that in all

---

16 buildings and approximately 40 apartment units. The Ozarks occupied an upstairs unit.

2. Applying Boyle's Law as their mechanical stare decisis, plaintiffs' brief elaborates on the physical phenomenon: assuming a loss of 10 to 15 gallons, the volume of water lost would have been between 2310 and 3465 cubic inches; with

one-inch water pipes having a cross sectional area of .788 square inches, the pipe would have contained between 244 and 376 feet of air in the space formerly occupied by the water; applying Boyle's Law, this air, then at atmospheric pressure of 15 pounds psi was compressed under water pressure of 70 to 75 psi to a space between 45 and 61.8 feet. When the pressure was re-

probability it was pressure from this air being compressed that gave the explosive driving force to the water or air as it first came out of the hydrant when opened by the little boy.

While this was not expressly contradicted, the jury was not compelled to accept this opinion. Concessions and questioned hypothesis, typical of cross examination of an expert, plus factual evidence from some tenants on the possible opening of other faucets on the line between the time of the completion of the repair job and Dwain's injury, permitted the jury to accept or reject its teaching. But it was probative evidence available for consideration by the jury under adequate instructions.

In the Court's charge to the jury, the negligence specifically alleged—failure to bleed off the air—was expressly submitted. But the Court declined the request to instruct the jury on the nature and application of the theory of res ipsa loquitur. The jury was thus not told that under the certain circumstances and conditions indigenous to this theory the happening of the accident could itself be considered as proof of negligence.

■ It is difficult for us to see what was the rationale of the Trial Court's refusal. Apparently it thought that if the accident would have happened had these circumstances been repeated the day before or the day after, there would be an insufficient showing that it " * * wouldn't happen in the ordinary course of things."[3] This, we believe, is a basic misapprehension of the theory. The doctrine comes into play not because the event or result would or would not occur. The theory applies because the circumstances are such as to justify the inference that *if* the event occurs, it would not ordinarily happen *unless* the actor was negligent.

If the refusal was because the Court thought that the probable cause had been fully identified as excessive air pressure not properly bled off resulting from the manner of making the repairs, this would not prevent the application of the doctrine. If the occurrence is such that it ordinarily would not take place without negligence, the basis for that inference is strengthened, not weakened, by evidence which points strongly to the mechanism of harm and causation.[4]

Here on the evidence the jury could reasonably find that the bottle shattered from an explosive force and that this force was caused by the sudden release of excessive air pressure within the water lines of this apartment project. We think also that the jury, from the ordinary experience of men, could infer that

leased by opening the water faucet, this air would rapidly expand and alone or with water subject the glass bottle to sufficient force to explode it. To this the plaintiffs' expert also applied Bernoulli's principle that "where the velocity is the greatest, the pressure is the least. * * * [so that] When that air rushes or water rushes down to the end of that bottle, it pulls air in and around the neck to go in with it * * * [so that the] * * greatest pressure would be on the bottom of the bottle * * *."

3. In the course of colloquy with counsel in the exceptions to the charge, the Court stated:
"* * * here there is no testimony whatever that if the pipe had been disconnected out there the next day at the same place and for the same length of time and if somebody had gone to this same faucet and hooked a milk bottle on it and turned it on, *that it wouldn't have done the same thing*. There isn't any testimony here what would have happened the next day just as well the day it did happen. I don't see where you get on your proposition that in the ordinary course of things it wouldn't happen. *What proof is there that it wouldn't happen in the ordinary course of things?*" (Emphasis supplied.)

4. The plaintiffs point out that there are numerous Texas decisions in which res ipsa loquitur has been applied in cases where the mode of the accident was well known. E. g., Texas Power & Light Co. v. Bristow, Tex.Civ.App., 213 S.W. 702 (error refused); Ischar v. West Texas Utilities Co., Tex.Civ.App., 54 S.W.2d 842 (error refused); Simpson v. Dallas Ry. & Terminal, Tex.Civ.App., 143 S.W. 2d 416 (error dismissed); Armstrong Packing Co. v. Clem, Tex.Civ.App., 151 S.W. 576 (error refused).

water from a hydrant at the ordinary usual pressure would not explode a milk bottle or similar glass bottle.

As an occurrence then this event was surely within the class which Texas considers warrants the inference of negligence. Does the event satisfy the other Texas requirements?

■ The principal one is that the instrumentality causing the harm must have been in the exclusive management and control of the defendant. But this is no mere shibboleth. It is but another way of saying that "* * * the circumstances must point an accusing finger at the defendant if he is to be held liable for negligence. This is the function of the requirement that the accident be caused by instrumentalities under the management and control of the defendant," Res Ipsa Loquitur in Texas, 26 Texas Law Review 257, 761 at page 263.

As the doctrine comes into play here because it was a glass bottle which ordinarily does not shatter when filled from a residential water hydrant, it is perfectly apparent that the instrumentality of harm was the air and water pressure in the line, not the bottle. Consequently, all of the subtle casuistry [5] of City and Manor somehow to raise proximate cause as an insuperable obstacle or fix responsibility for this event on the act of the

little boy, a neighbor lady in leaving a milk bottle exposed on a nearby back porch on the theory that neither of the defendants had requisite control, misses the whole point.

The exclusive control and management of the instrumentality of harm need not be at the precise *time* of the injury. It is sufficient if it existed at the time the probable negligence [6] inferred from the resulting occurrence took place, and the record establishes by a preponderance of the evidence that nothing intervened either by plaintiff or third persons to have substantially altered the instrumentality. Honea v. Coca Cola Bottling Company, 143 Tex. 272, 183 S.W.2d 968, 970, 160 A.L.R. 1445 (Com.App. opinion adopted by Sup.Ct.); Hankins v. Coca Cola Bottling Company, 151 Tex. 303, 249 S.W.2d 1008, 1009, "* * * it is necessary for the plaintiff to establish by a preponderance of the evidence that the instrumentality * * * was not damaged by some intervening force between the time of its last handling by the defendant and the final occurrence which causes the damage." Benkendorfer v. Garrett, Tex.Civ.App., 143 S.W.2d 1020, 1021.

■ So long as it is kept in mind that it is not the pipes, or the water main, or the faucet, or the glass bottle which is the

---

5. The City's brief states: "If a neighbor had not left a bottle on the step the accident would not have occurred; if the child had not attempted to fill the bottle with water, the accident would not have occurred; and if the child had not turned on the water faucet, with the neck of the bottle around the hydrant, the accident would not have occurred. In other words, the meddling of the plaintiff himself caused the accident that would not have occurred had he not done so * *."

It is easy to see that such reasoning soon takes us to the existence of Dwain himself, shortly his parents and their antecedents and thence back to the creation. Judge Holmes in New York Life Insurance Company v. Schlatter, 5 Cir., 203 F.2d 184, has recorded for us the pithy but ancient learning quoted in Lawrence v. Accidental Insurance Company, L.R. 7 Q.B.Div. 216: "Lord Bacon's language in his Maxims of the Law,

Reg. I, runs thus:—'It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause.' Therefore, I say according to the true principle of law, we must look at only the immediate and approximate cause of death; and it seems to me to be impracticable to go back to the cause upon cause, which would lead us back ultimately to the birth of the person; for if he had never been born, the accident would not have happened. * *"

6. The author of Res Ipsa Loquitur in Texas, op. cit., supra at 268, makes this summary: "It seems fairly obvious from an overall view of the Texas cases that 'control of the instrumentality' may be safely interpreted as meaning control of the factors around which negligence was probably centered at the time the negligence probably occurred."

instrumentality causing harm, and that that agency is the excessive air and water pressure within the lines, no difficulty is encountered on management and control. That applies as well to the necessity here of a simultaneous control and management by both defendants. This was, of course, the fact. The work was being done and had an immediate effect on both systems and mechanically this could not be avoided. With free air in either of the two sets of lines at the site of the repair job, its physical significance operated on the water in all of the lines between the two master valves. And on the assumption that the unusual nature of the occurrence warrants the inference of a negligent failure adequately to bleed off the air, this required that on completion of the repair job it be done in such a way that air be removed from both parts of a physically common system. The work inevitably affected both parts of the system; it was being done for both, and either by both or by one on behalf of both; and both were fully informed of what was being done and, equally important, what was not done.

On the second subsidiary requirement of the element of control—evidence that subsequent acts have not intervened adversely to change the instrumentality—the record is abundantly sufficient. The excessive air and water pressure could certainly not have been *put* in the system by little Dwain or any other person on or near the premises. The record shows only one possible source—the making of the repairs. The possibility of an *unexplained* increase in water pressure from causes beyond the control of either defendant was positively negatived by the City's own continuous record pressure chart. This irrefutable mechanical silent witness showed that pressure during the 24-hour period of July 6 on the water main was nearly constant varying from 80 to 90 psi with an average of 85 pounds.

The City's expert established without contradiction that in the distance between the main pumping station and the master valve near Manor, the pressure in the lines on Manor's premises would be from 70 to 75 psi. The evidence adequately demonstrated that nothing done by parties other than the defendants between the time the repair job was completed and the time of Dwain's injury, some four or five hours later, could have altered adversely the forces within this water system. Acts of others might have made matters better,[7] but they did not make them worse.

A doctrine whose genesis is due largely to the complexities of our ever-expanding machine and scientific civilization must reckon with the realities of a particular field. Control is not to be measured in any artificial way by ownership or possessory rights in pipes or wires or mere physical appurtenances. If hydraulic or pneumatic *forces* are the cause of harm, and they are within the control and management of the defendants, then, like electrical forces, Texas Power & Light Co. v. Bristow, Tex.Civ. App., 213 S.W. 702 (error refused); San Juan Light & Transit Company v. Requena, 224 U.S. 89, 32 S.Ct. 399, 56 L. Ed. 680; Ischar v. West Texas Utilities Co., supra, they subject such persons to the liabilities of this doctrine.

This occurrence came within the classic case and satisfied the essential conditions of the theory. But the theory, grounded, to be sure, in human experience, is yet a legal one. For a jury to be aware that it may draw a conclusion of fault and negligence from the damaging event, the jury must somehow be told. We cannot assume that had it been properly instructed on the permissible use and application of the doctrine, the result would have been the same.

Reversed and remanded.

---

7. E. g., opening faucets which, defendants asserted would have the effect of bleeding off excessive air or water pressure.