**UNITED STATES of America,**
**Appellant,**

v.

**G. V. JOHNSON, and his wife Letha**
**Johnson, Appellees.**

**No. 18267.**

United States Court of Appeals
Fifth Circuit.

Feb. 23, 1961.

Kathryn H. Baldwin, Anthony L. Mondello, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., John R. Green, Asst. U. S. Atty., Houston, Tex., George Cochran Doub, Asst. Atty. Gen., William B. Butler, U. S. Atty., Houston, Tex., for appellant.

Warner F. Brock, Jimmy F. Y. Lee, Brown, Bates, Brock & Morgan, Houston, Tex., for appellees.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a five thousand dollar judgment against the United States under the Federal Tort Claims Act [1] for personal injuries consisting of nervousness and aggravation of a heart condition from which Mrs. Johnson was suffering. The appellant makes three contentions of error:

1. That the action was barred by the two-year limitation period in the Act;

2. That the rule of *res ipsa loquitur* was not applicable in determining negligence of the Govern-ment in the airplane crashes which occurred; and

3. That the doctrine of *volenti non fit injuria* is applicable and is a complete defense.

Limitations.

28 U.S.C.A. § 2401(b) provides that, "A tort claim against the United States shall be forever barred unless action is begun thereon within two years after such claim accrues." An action is commenced by the filing of a complaint.[2]

The second amended complaint upon which trial was had and judgement rendered was filed on March 21, 1958. It described seven crashes of aircraft on routine missions from Foster Air Force Base and alleged that "defendant was negligent in each and every one of the foregoing instances where defendant's planes crashed in, on or about the land leased by plaintiffs." It further alleged that the planes came closer to plaintiffs' home than permitted by the avigation easement. The last alleged crash was on August 17, 1955, more than two years before the second amended complaint was filed.

The original complaint had been filed on March 26, 1956, well within the two-year period. It alleged generally the flight of aircraft over the plaintiffs' house, the crash of planes "within plain view of plaintiffs' house," and the crash on one occasion of the body of a pilot on the ground "very close to plaintiffs' home"; Mrs. Johnson's heart condition and repeated attacks brought on by fear and anxiety because of the flights; visits by employees or agents of the United States and representations by them that plaintiffs "would be moved from the home and compensated within sixty (60) or ninety (90) days"; "renewed promises" of like nature; failure by the Government to make such payment; plaintiffs' inability to move because of lack of funds; and damages sustained in the amount of $50,000 by Mrs. Johnson and $1,000 by Mr. Johnson for medical bills.

---

1. See 28 U.S.C.A. § 1346(b), § 2674.

2. Rule 3, Federal Rules of Civil Procedure, 28 U.S.C.A.

Paragraph 5 of the petition read as follows:

"Plaintiffs allege that the cause and the proximate cause of their injuries and damages, as hereinabove set forth, is the negligence and wont of ordinary care on the part of Defendant, its agents, servants, and/or employees, *in failing to perfect the process of reimbursing or compensating Plaintiffs for their property, so that Plaintiffs might move from the vicinity of Foster Air Force Base.*" (Emphasis supplied.)

The original complaint contained no allegation of any specific crash or illegal low-level flight; and it contained no allegation of any negligence on the part of the United States in connection with any crash or crashes or any flight or flights.

No significant change was made until the filing of the second amended complaint. The question, then, is whether the second amendment relates back to the filing of the original complaint. Rule 15(c), Federal Rules of Civil Procedure, provides as follows:

"(c) *Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." Title 28 U.S.C.

Judge Sibley, speaking for this Court, has well said:

" * * *. Limitation is suspended by the filing of a suit because the suit warns the defendant to collect and preserve his evidence in reference to it. When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action

or the relief prayed or the law relied on will not be confined to their first statement."

Barthel v. Stamm, 5 Cir., 1944, 145 F. 2d 487, 491.

Professor Moore states the general rule as follows:

" * * * * If the original pleading gives fair notice of the general fact situation out of which the claim or defense arises, an amendment which merely makes more specific what has already been alleged generally, or which changes the legal theory of the action, will relate back even though the statute of limitations has run in the interim."

3 Moore's Federal Practice, 2d ed., p. 852.

Though there was a complete change in the legal theory of plaintiffs' complaint, their claim continued to arise out of the conduct, transaction or occurrence attempted to be set forth in the original complaint. We hold, therefore, that the second amendment relates back to the date of the original complaint, and that the action was not barred by the two-year limitation in the Federal Tort Claims Act.

### Res Ipsa Loquitur

■ *Res ipsa loquitur,* in Texas as in many other jurisdictions, permits an inference of negligence when the evidence establishes that (1) the particular thing causing the injury was under the management of the defendant; and (2) the accident is such as in the ordinary course of things does not happen if those who have the management use proper care.[3]

At a pretrial conference, the following facts were conceded:

"Of the seven aircraft accidents alleged in the complaint, at least the two on July 22, 1954, and July 27, 1954, occurred on the land leased by the Johnsons, and one was a skid off the northwest-southeast runway

---

**3.** Wichita Falls Traction Co. v. Elliott, 1935, 125 Tex. 248, 81 S.W.2d 659, 664; Ozark v. Wichita Manor, 5 Cir., 1958, 252 F.2d 671, 674; Williams v. United States, 5 Cir., 1955, 218 F.2d 473, 475; Prosser on Torts, 2nd ed., Sec. 43, pp. 211, et seq.

onto the Johnson's leasehold. This was on March 21, 1955, and occurred because of an aborted take-off attempt. Of the other four, two occurred approximately three miles from the Johnson's house on February 25, 1955, and August 17, 1955. The next was on June 8, 1955, at a place to be determined by the evidence. The seventh occurred one mile north of Foster Air Force Base on April 5, 1955. In each instance the aircraft were, and at all times material hereto had been, under the exclusive control of the defendant and the pilots and crews thereof were within the scope and course of their employment. The crews were killed in the crashes of July 27, 1954, February 25, 1955, and August 17, 1955. The accident of July 22, 1954, was a result of a power failure during landing. The crash of July 24, 1954, occurred in landing, and the June 8, 1955, accident occurred as a result of a power failure in take-off."

The best evidence of the cause of each of these crashes rested with the Government and was not available to the plaintiffs. The district court found:

"The airforce (sic) investigated immediately after each of the crashes and plaintiffs were unable to secure these reports. Defendant's counsel says that the reports were not produced because plaintiffs originally sued on the theory of nuisance and the records cannot now be secured; but the original complaint, filed March 26, 1956, less than 10 months after the last crash, alleged a number of crashes in the vicinity of plaintiffs' dwelling, and claimed jurisdiction and sought recovery under the Torts Claims Act. Defendant has shown no good reason for not producing the records which might have overcome the inference of negligence."

As has been noted, the Government conceded that the crash of July 22, 1954 was a result of power failure in landing, that of July 24, 1954 occurred in landing, that of March 24, 1955 occurred because of an aborted take-off attempt, and that of June 8, 1955 occurred as a result of a power failure in take-off. The Fire Chief at Foster Air Field testified his records showed that in the crash of February 25, 1955, death of the pilot was caused from explosion on impact, and that the crash of April 5, 1955 was caused by a flameout on landing. Unable to secure more specific information from the Government records, the plaintiffs introduced Edward Taylor Moore, a former jet pilot, based at Foster Air Force Base from September 3, 1954 until his discharge on May 12, 1957, who testified in part as follows:

"Q. Now Mr. Moore, I want you to tell me what is the cause of a flameout? A. Fuel starvation.

"Q. And what causes fuel starvation? A. Most of the time, it is an error on the part of the pilot.

"Q. Now would you explain for us, sir, how a flameout is due to an error on the part of the pilot? A. Generally, I would say it is improper planning. For instance, he might plan to go 50 miles farther than he has fuel to carry him, or becoming deorientated in the air, getting lost. Or often they are caused in weather conditions, when you just keep trying to land and don't make it, but that also, the pilot shouldn't have been there in the first place.

"Q. Did you have regular safety meetings when you were assigned to Foster? A. Yes, sir.

"Q. And at those safety meetings, they were held by squadrons, were they not? A. They have them regularly by squadrons and fairly regularly by group, and sometimes all the pilots on the base. But every day, you would have some type of—

"Q. Did they have those from the time you went there in 1953 until the time you left in 1957? A. Yes, sir.

"Q. Did you receive what the government termed as confidential

or classified reports, not only about accidents that occurred at Foster, but at other jet bases? A. Yes, sir.

"Q. Now based upon those reports that were furnished you,— they were furnished in the regular course of teaching you about the cause of prior accidents and how to minimize them or correct them? A. Yes, sir.

"Q. Now during the years of 1953 and '54 and '55 and '56, and until you left there in 1957, were you able to form an opinion based on the accident reports that were furnished you men by group or squadrons to study from all of the jet bases, were you able to form an opinion about the percentage of airplane crashes occurring at Foster? A. Yes, sir.

"Q. And what was your opinion?

\*    \*    \*    \*    \*    \*

"A. The whole time I was there, accidentwise. We had an atrocious accident rate. I suppose the easiest way to explain it is in these meetings. We have required meetings in group discussions of each individual accident that happens in our command, which was TAC. There might be nine fighter bases in TAC. It varies, but usually there were about nine. We cover each one of those accidents, and talk about what the guy did, what he should have done, and just the regularity in which our own accidents were involved. It is not really an opinion. Foster had more accidents than anyone in TAC.

"Q. Foster did what? A. They had more accidents reported on these reports, and we had reports of every major accident.

"Q. Foster had more than all the others combined? A. I wouldn't say that. No, that would be wrong.

"The Court: He said more than any other. A. Yes, sir.

"Q. All right. Now at those metetings (sic) where you had these safety discussions, talked about not only the cause of crashes at Foster, but the cause of these reported crashes at other bases, can you recall a single one where pilot error was not involved in the crash? A. Yes, sir.

"Q. All right. How many can you recall where pilot error was not involved? A. Are you restricting me in this question to the years, or just the whole time I was there.

"Q. During the whole time you were there. A. Well, the first one I recall, a pilot went out to Los Angeles to pick up—

"Q. Without telling me what happened, sir, just tell me the number. A. Oh, I would say maybe five.

"Q. Five accidents out of all that time whereby pilot error was not involved, is that correct? A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. Of those five, was maintenance error involved in any of them? A. Yes, sir.

"Q. Now out of that five, how many was maintenance error involved in? A. Well, I would say three.

"Q. Three of them. A. But the other two that I am thinking of right now, it is hard to say it was maintenance error. The malfunction should have been discovered by maintenance personal (sic).

"Q. In other words, in all five of them, when you get right down to it, it was a maintenance error, is that correct? A. I would say so, yes, sir.

"Q. That is your opinion about it?

"The Court: In other words, maintenance means not only to repair, but to discover the need of repair in time to make it before it is discovered in the air? A. Very definitely, yes, sir."

Mr. Moore further testified that pilot error included situations in which the error was merely one of judgment on the part of the pilot in an emergency. The appellees insist that he tesified that the Air Force found 80 per cent of crashes and airplane accidents due to *negligent* pilot error. That is not clear to us from his answer:

"The Court: Well, then, can you give any estimate, percentagewise, on, we will say, accidents due to the pilot's negligence and accidents due to spur-of-the-moment understandable exercise of judgment as to what is best to do at the time?

"A. Well, sir, accident investigating boards, after each accident, look into these things, and I think they approach it just about by the same standards I do. They might be a little bit more critical of the pilot, but I doubt it. They have figures to show. An accident might be due to a slight percentage of pilot error, or a hundred percentage of pilot error. They take all of these reports and shuffle them on some desk some place, and compile what percentage of accidents are due to pilot error, and those I have read in the past, they vary for every year. They will put out a survey for the last six months, say, and I have read the percentages. I think accidents due to pilot error, in the period I was in the Air Force and very vitally interested in that type of thing, were probably 80%, an average, where some type of pilot error was involved. Now I am just judging on somebody else's paper work, but I think they approached their paper work by the same standard I would. I can't draw this line between should he have gotten the throttle off or shouldn't he, and whether or not that was pilot error. Those facts aren't available to me."

The district court found that the plaintiffs had produced enough evidence to show that in the ordinary course of things these accidents would not have occurred if the Government and its agents and employees had been diligent. "Certainly a preponderance of the evidence indicates that these planes would not have crashed in the absence of negligence either in inspection, maintenance or operation." That finding, if sustained, clearly distinguishes this case from Williams v. United States, 5 Cir., 1955, 218 F.2d 473, so strongly relied on by the Government. See also, Sapp v. United States, D.C.W.D.La.1957, 153 F. Supp. 496, 500. We think that finding of the district court must be sustained. The failure to produce more satisfactory evidence of negligence vel non is chargeable to the Government rather than to the plaintiffs. The failure of a part to produce relevant and important evidence within its peculiar control raises the presumption that if produced the evidence would be unfavorable to its cause.[4] Under the circumstances of this case, the district court did not err in applying the doctrine of *res ipsa loquitur*.

### Volenti Non Fit Injuria.

The Supreme Court of Texas has said that for a person to have assumed the risk under the doctrine of *volenti non fit injuria*, it must appear that "with full knowledge of the nature and extent of the danger involved he put himself in the way of the particular risk involved as a result of an intelligent choice." Triangle Motors of Dallas v. Richmond et al., 152 Tex. 354, 258 S.W.2d 60, 64, affirming Richmond et al. v. Triangle Motors of Dallas, Tex.Civ.App., 254 S.W.2d 172.[5] Clearly, we think, the plaintiffs

4. Kirby v. Talmadge, 1895, 160 U.S. 379, 383, 16 S.Ct. 349, 40 L.Ed. 463; Foust v. Munson S.S. Lines, 1936, 299 U.S. 77, 86, 57 S.Ct. 90, 81 L.Ed. 49; Interstate Circuit v. United States, 1939, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610; 2 Wigmore on Evidence, 3rd ed., §§ 285, et seq. The rule is applicable even in criminal cases. Ford v. United States, 5 Cir., 1954, 210 F.2d 313, 317.

5. See also, Commins v. Halliburton Oil Well Cementing Co., Tex.Civ.App., 1959, 319 S.W.2d 379; Kirby Lumber Corp. v.

could not be charged with notice that repeated airplane crashes would be caused by the Government's negligence. Nor could the plaintiffs be charged with notice that those crashes would so adversely affect Mrs. Johnson's nervous system and aggravate her heart condition.

The judgment was right, and it is

Affirmed.

TUTTLE, Chief Judge (dissenting).

With deference to the views of my colleagues, I respectfully dissent.

I think it is clear that the two-year statute of limitations had barred the action for damages based on the separate individual airplane crashes long before any recovery was sought based on any such acts of the United States.

As is clearly shown by the quotations in the majority opinion, the suit was filed specifically on an act of negligence entirely unrelated to the individual airplane crashes. It alleged:

"Plaintiffs allege that the cause and the proximate cause of their injuries and damages, as hereinabove set forth, is the negligence and wont of ordinary care on the part of Defendant, its agents, servants, and/or employees, *in failing to perfect the process of reimbursing or compensating Plaintiffs for their property, so that Plaintiffs might move from the vicinity of Foster Air Force Base.*" (Emphasis supplied by the majority opinion.)

The complaint contained no allegations of any specific crash or illegal low-level flights; in contained no allegation of any negligence on the part of the United States in connection with any crash or flight.

It seems to me that the language quoted from Barthel v. Stamm, 5 Cir., 145 F.2d 487, 491, when applied to the pleadings here demonstrates beyond any doubt that these claimed torts were barred by the statute. The original com-

plaint gave no notice of any kind that an inquiry would be made by the court into the cause of any crash. It put the United States on notice only that it must be prepared to produce all the records and information it had respecting the alleged visits by agents of the Government, and alleged representations that the plaintiffs would be moved and compensated, and the failure of the Government "to perfect the process of reimbursing or compensating plaintiffs for their property." In point of fact, this complaint failed so utterly to allege a claim under the Tort Claims Act that the Government could, it seems to me, have ignored it completely.

Moreover, the facts developed on this trial demonstrates the reason for the rule announced by this court in the Barthel case. The Government was unable to produce records of the investigation as to the cause of each accident, because, as the trial court said in its statement, "defendant's counsel says that the reports were not produced because plaintiffs originally sued on the theory of nuisance and the records cannot now be secured." Nothing said in the complaint gave the defendant any notice that an inquiry into the cause of the crashes would be needed for the trial if the case ever progressed to a trial. Thus, in this very case, the defendant is greatly prejudiced by the court's ignoring the limitation point as it affects amending a complaint.

The prejudice to the defendant is made fully apparent here because the court finally decided the case on the doctrine res ipsa loquitur. In other words, the application of this principle puts the full burden on the defendant to prove absence of negligence on its part after permitting the statute to run and lull the defendant into disposing of the only records from which such proof could be forthcoming.

Furthermore, I think this is not a proper case for application of the doctrine res ipsa loquitur. It is *not* true that a jet airplane crashes only if the

Murphy, Tex.Civ.App., 1954, 271 S.W. 2d 672; Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607; Wood v. Kane Boiler

Works, 150 Tex. 191, 238 S.W.2d 172; see Walsh v. West Coast Coal Mines, 31 Wash.2d 396, 197 P.2d 233.

pilot is *negligent*. Such crashes may be attributable to many things, such as structural defects, conditions of weather, excusable errors in pilot judgment falling far short of pilot *negligence*, and the like. I think the case falls within the principles laid down by this Court in Williams v. United States, 5 Cir., 218 F.2d 473. In fact, the trial court completely waters down the basis for applying the doctrine res ipsa loquitur, for the court finally says: "Certainly a preponderance of the evidence indicates that these planes would not have crashed in the absence of negligence either in inspection, maintenance or operation." Of course, nothing at all was proved as to these particular crashes. The court thus based the application of res ipsa loquitur on its finding that "a preponderance of the evidence indicates * * * negligence."

I would reverse and render judgment for the defendant.