Dr. Benjamin MOSIER, Mrs. Doreen Mosier and Marc Mosier

v.

AMERICAN MOTORS CORPORATION and American Motors Sales Corporation.

Civ. A. No. 64-H-461.

United States District Court
S. D. Texas,
Houston Division.

Sept. 18, 1967.

46

Edmund L. Cogburn & Abraham P. Friedman, Dow, Dow, Cogburn & Dow, Houston, Tex., for plaintiffs.

John T. Golden; Vinson, Elkins, Weems & Searls, Houston, Tex., for defendants.

## MEMORANDUM OPINION

SEALS, District Judge.

This is a diversity-jurisdiction suit arising out of an automobile accident in the State of Ohio in 1962.

The facts appear largely undisputed that Abraham J. Mintz purchased a 1962 four-door Deluxe Rambler American Sedan on December 1, 1961, from Jack O. Becker, d/b/a Becker Rambler Sales, Dayton, Ohio. Approximately nine months later on August 24, 1962, at about 1:55 P.M., Mr. Mintz, age 72, was driving along U. S. Route 40 east of Springfield, Ohio. He was proceeding in an easterly direction in the left lane of the four lane highway at about 55 miles per hour. The four lanes are separated in the middle by a depressed and grassy neutral ground, with a negligible drop

from the pavement to the graveled shoulder. In the immediate area of the accident the highway was straight and smooth. The day was clear and calm.

In the right front seat opposite the driver was Dr. Mosier; Mrs. Mosier was directly behind him in the back seat; and Marc Mosier, age 7, was seated to the left of Mrs. Mosier immediately behind the driver. This was the position of the occupants when the accident happened. The vehicle went to the left, running partially off the roadway, then swerved to the right, going diagonally across the right lane and ran off the right side of the highway, turned over at least once, coming to rest on its top. The speedometer registered 2920 miles. Witnesses who arrived at the scene immediately after the accident testified, using various terms, that a part of the steering mechanism assembly was disconnected. Mr. Mintz died as a result of injuries suffered in the accident, and the other occupants of the automobile sustained injuries.

It was agreed by all parties to this suit that this Court has jurisdiction to hear and determine the matter pending before it.

It was stipulated that:

(1) Plaintiffs Dr. Benjamin Mosier, Mrs. Mosier and Marc Mosier, a minor, acting by and through his natural father, Dr. Benjamin Mosier, are citizens of the State of Texas and residents of Harris County, Texas.

(2) Plaintiff, Ben B. Hammerman, Executor of the Estate of Abraham J. Mintz, deceased, is the duly authorized, qualified and appointed Executor of the Estate of Abraham J. Mintz, and is a resident of Montgomery County, Ohio, and is qualified as temporary administrator of said Estate in the State of Texas.

(3) Defendants American Motors Corporation, a Maryland Corporation, and American Motor Sales Corporation, a Delaware Corporation, are licensed to do business, and are and have been doing business in the State of Texas and within this judicial district.

Plaintiff Marc Mosier asks damages in the amount of $250,000.00 for physical impairment, pain and suffering, loss of earning capacity and emotional and psychic upset. The parents of Marc Mosier, Dr. Benjamin Mosier and Mrs. Doreen Mosier, ask damages in the amount of $20,000.00 for the loss of his services.

Dr. Benjamin Mosier seeks damages for physical impairment, loss of earnings, loss of earning capacity, pain and suffering and emotional and psychic upset in the amount of $25,000.00. And Mrs. Doreen Mosier says she incurred physical impairment, pain and suffering, loss of her contribution in services to the community of herself and Dr. Mosier and emotional and psychic upset to her damage and the damage of the community estate of herself and Dr. Mosier in the amount of $25,000.00.

The medical and drug expenses sought by the above Plaintiffs are: Marc Mosier, $171.35; Dr. Mosier, $235.20; and Mrs. Mosier, $522.50.

Mr. Ben B. Hammerman, as Executor of the Estate of Abraham J. Mintz, asks damages in the amount of $1,350.00 for the total loss of the 1962 Rambler American automobile, $1,284.90 for hospital and medical expenses, $1,035.77 for funeral expenses, $35,000.00 for pain and suffering and emotional and psychic upset suffered by Mr. Mintz from the date of the accident to the date of his death, and $15,000.00 pecuniary damages to which the children of Mr. Mintz are entitled as a result of his death.

The Plaintiffs contend that the accident and injuries were caused by a defect in the Rambler Sedan. They say that the automobile's cross linkage tube was defective and failed to hold the ball stud; that the separation occurred prior to the crash as Mr. Mintz drove along the highway. The part known as the ball stud or steering ball is the vital connecting link between the driver's steering

shaft and the front wheels. In viewing the assemblage from the driver's position, the steering wheel and shaft are connected to the intermediate cross linkage tube by the Pitman arm and ball stud. This intermediate tube subsequently connects at each end to tie-rods which ultimately connect to the front wheels.

Plaintiffs allege that the Defendants were negligent in using a tubular design rather than solid rod design for the intermediate cross bar, and that the failure to use a stronger steel in the fabrication of the cross linkage tube also constituted negligence. In addition the failure to perform adequate tests of the steering mechanism and its component parts to determine if the vehicle was free from defects because of faulty design or fabrication was said to have constituted negligence. Plaintiffs also maintain that negligence of the Defendants may be inferred by application of the doctrine of *res ipsa loquitur.*

Plaintiffs further contend that Defendants breached implied warranties assumed by the Defendants as manufacturer-seller of the automobile that it had been properly designed for the use for which it was purchased and that it had been properly assembled with parts that were adequately constructed for such use. And they say that as to Mr. Mintz these warranties were express.

The Defendants have urged in the main that the Plaintiffs' allegations are without merit because they are solely based on the highest degree of conjecture and speculation. Defendants maintain that the evidence does not disclose the cause of the Mintz car going out of control and that the elderly driver could have panicked as he veered off the road to the left, over-corrected the steering, causing the automobile to shoot to the right with an attendant loss of control and turn over. They also urge that it is no more than a guess that the cross-tube broke or cracked prior to the accident, and that the only circumstances the

Plaintiffs can rely on is that the cross linkage tube was found broken after the car came to rest following the turning over.

Defendants submit that if the ball stud was disconnected from the cross tube an automobile would not react as the Mintz vehicle did. As evidence of this contention the Defendants tendered a motion picture of an automobile traveling at a very low rate of speed in a parking lot with its pitman arm and ball stud disconnected from the cross tube. It is also submitted that the cross-tube fracture and the consequential pulling out of the ball stud occurred in the roll over of the Mintz automobile as a result of the outside force against the wheels.

■ Plaintiffs have failed to prove by a preponderance of the evidence that the defendants were negligent in using a tubular designed cross linkage tube rather than solid rod type. They have also failed to prove by a preponderance of the evidence that the Defendants were negligent in not using a stronger steel in the cross linkage tube.

Plaintiffs' experts testified that a solid rod cross-bar would have been stronger than the tubular cross-bar; and that a 1038–1040 steel, which has a higher tensile strength by virtue of a higher carbon content, should have been used in the tube instead of SAE 1010 steel. Defendants' experts testified, however, that the tubular design had been used in the automobile industry for over thirty years and that American Motors had been using this particular tubular designed cross-bar with success since the early fifties. The 1010 tube had been used in the American Rambler since 1952 even though, according to Defendants' experts, the solid rod was less expensive. Defendants maintained that the Rambler American began using the solid rod in 1964 simply because of geometric reasons. In the trend to longer and lower cars and ball joint suspension systems, the tubular cross-bar was too bulky at the wheels and would not fit. Defend-

ants rightly pointed out that not only had the 1010 tube held up over the years but that one of Plaintiffs' experts had admitted that a 1038–1040 steel would have been more brittle. Therefore in considering strictly the design and fabrication of the cross-tube, the Defendants have not been shown to have been negligent.

The primary question in this cause is now posed: When did the ball stud separate from the cross linkage tube? Was it solely a result of the impact as the car rolled over? Or did it occur as Mr. Mintz was driving down the highway, causing him to lose control of the steering assembly and thereby causing the crash and the resultant injuries and death? Plaintiffs' experts contend that there was initially a fracture in the intermediate cross linkage tube at a point where the ball stud fitted into a hole in the tube. The fracture, they say, was caused by tension; and because there was evidence of battering and polishing on the edges of the crack in the tube, the fracture had existed for some time. (This lengthy existence of the fracture would refute Defendants' contention that the cross-tube broke only as a result of the car rolling over.) As the hole in the tube spread apart, the ball stud eventually worked loose and pulled out. After the ball stud pulled out, the break in the tube was then completed according to Dr. William H. Tonn, Plaintiffs' consulting engineer and accident reconstruction expert. With the ball stud separated, the steering wheel could be turned, but there would be no control over the front wheels.

This explanation of the accident is supported by the testimony of two of the crash victims, Dr. and Mrs. Mosier.

Mrs. Mosier testified that the automobile began to vibrate and Mr. Mintz appeared to be fighting the steering wheel. As he moved the steering wheel the car did not seem to move in the direction he was turning. It seemed to her that the deceased was turning the steering wheel but there was no response. Then as the automobile veered to the left it appeared to be out of control, the steering wheel "going around" as Mr. Mintz tried to prevent the veer to the left side of the roadway. Then, suddenly, said Mrs. Mosier, the car veered to the right.

Dr. Mosier also testified that the car began to vibrate, shaking from back to front, then it veered to the left, then right, and turned over.

In the few miles in which the automobile was driven, there is no reason to believe that Mr. Mintz used the automobile in any other than the normal way, or that he was ever involved in any other accidents with the car. There was testimony from Mr. Hammerman, his close friend, and executor of his Estate. Mr. Hammerman had been in continual contact with Mr. Mintz and knew of no prior accident with the automobile; nor did he know of any dissatisfaction with the automobile. Mr. Mintz, although 72 years of age, was in good health. He was a retired accountant and reputedly methodical in his approach to things. There was medical testimony that he had suffered no heart attack immediately before or after the accident.

The defendants offered evidence to show that if an automobile had its Pitman arm disconnected from the intermediate cross linkage tube it would not react as the Mintz car did. Plaintiffs' expert testimony, of course, took another view. The exact conditions of that fateful day were not and perhaps could not be duplicated in a laboratory. Plaintiffs' expert testimony, namely Dr. Tonn, pointed out that many factors would have a bearing on just how an automobile would react when the ball stud parted from the tube while an automobile was traveling at 55 miles per hour. A test as offered by the Defendants of an automobile at 5 miles per hour in a parking lot cannot be said to be dispositive of this issue.

This Court finds that the ball stud pulled out from the hole in the cross linkage tube as Mr. Mintz drove along the

highway. The tube was defective in that it failed to hold the ball stud because of a fracture that initiated at the point in the tube where the ball stud connects. This fracture became progressively more pronounced as indicated by the battering and polishing of the edges of the crack, ultimately causing the ball stud to work loose and separate; and that as a result Mr. Mintz lost control of the automobile. The complete break in the tube at this ball stud opening came at the time the ball stud pulled out or sometime immediately thereafter. The loss of complete control of the car occurred when the ball stud pulled out, and that is the crucial point in time under these facts and circumstances. There is nothing to explain why the automobile should act as it did other than the fact that Mr. Mintz lost effective control because of a failure in the steering mechanism assembly.

All parties agree that as to matters of substantive law, the law of Ohio will be applied.

■ An action in tort for the breach of an implied warranty was recognized by the Supreme Court of Ohio in the recent case of Lonzrick v. Republic Steel Corporation, 6 Ohio St.2d 227, 218 N.E.2d 185 (1966). In an action in tort based upon breach of warranty no contractual relation between Plaintiffs and Defendants need exist. Id. at 192. See Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960); Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960); 18 W.Res. L.Rev. 664 (1967). Under Ohio law the manufacturer-seller of a product impliedly warrants in the sale of that product that it is of good and merchantable quality, fit and safe for its intended use. Thus a duty is placed upon a manufacturer-seller that is breached when the product proves defective and because of such defect the users of the product are injured. *Lonzrick, supra,* 218 N.E.2d at 191. To recover for such a breach, the Plaintiff must prove: (1) the existence of a defect in the instrumentality involved; (2) the instrumentality was defective at the time the manufacturer sold it; (3) the defect caused the failure while the instrumentality was being used for its ordinary intended purpose; (4) the defect was the direct and proximate cause of the Plaintiff's injury; and, (5) the Plaintiff's presence was in a place which the Defendant could reasonably anticipate. Id. 218 N.E.2d at 192, 193.

■ The elements listed above do not require that the Plaintiff read an advertisement or other written material published about the product. In *Lonzrick,* the Court said that an action in tort for breach of an implied warranty may lie as well as an action in tort for breach of an express warranty:

"The fact that the plaintiff saw the advertisement is a sound basis for recovery, *but the fact that he did not read an advertisement is not a sound basis for denying recovery.* Such a rule looks not to the product which produced the injury, but focuses upon the question of whether the plaintiff saw an advertisement, which is not relevant to the creation of the risk of harm to the plaintiff." Id. at 192; see also Restatement of Law of Torts, 2d, § 402A.

■ The kind and quantum of evidence needed to prove negligence by way of circumstantial evidence, with the help of the doctrine of *res ipsa loquitur,* and the problems relating to a proof of a defect that will constitute the basis for a finding of a breach of implied warranty are very much the same. See Keeton, Products Liability—Proof of Manufacturer's Negligence, 49 Va.L.Rev. 675 at 676, 681 (1963). If there is sufficient evidence of causation, *res ipsa loquitur* may be invoked to supply a reasonable inference of negligence. Dement v. Olin Mathieson Chemical Corporation et al., 282 F.2d 76 (5th Cir. 1960).

■ When sufficient evidence has been adduced by Plaintiff to show that injury resulted from a defect in the prod-

uct, the evidence must also justify the finding that the defect was probably present when the product left Defendant's control; and such defect was of a nature and kind that would not ordinarily be present in the instrumentality at the time of delivery by the manufacturer in the absence of negligence. Ozark v. Wichita Manor, 252 F.2d 671 (5th Cir. 1958). Lapse of time between the date Defendant surrenders control of the instrumentality and the date of the accident may be very important in determining whether or not a defect existed at the time of delivery. So, too, are the conditions under which the product was used —whether normal or abnormal. Id. at 675.

 It has been stipulated that the Defendants design, manufacture and sell Rambler American automobiles and that the automobile in question was among those vehicles placed in the streams of commerce by the Defendants. When this automobile was on the market in Ohio in 1961, the Defendants warranted by necessary implication that it was of good and merchantable quality and fit for the ordinary purposes for which such automobile was to be used. *Lonzrick, supra,* 218 N.E.2d at 191. The automobile in question was defective because it was not fit for the ordinary purpose for which such automobiles are used: that is, the automobile was sold by the Defendants with a defective cross linkage tube that would not stand up under normal use. And at the time of the accident the Mintz automobile was being used in a normal way. As a proximate result of the defect the ball stud separated from the intermediate cross linkage tube resulting in a loss of control of the automobile thereby causing the automobile to leave the roadway, turn over, and cause the injuries and fatality complained of by the Plaintiffs. The Plaintiffs were, under the attendant facts and circumstances, in a place where their presence was reasonably to be anticipated by the Defendants. The defect existed at the time the automobile

and its concomitant steering linkage system were sold by the Defendants; and, the defect was the direct and proximate cause of the Plaintiffs' injuries. Id. at 192, 193.

Plaintiffs have shown by a preponderance of the evidence and have convinced the Court that the cross linkage tube of this automobile was defective. Ford Motor Company v. Mathis, 322 F. 2d 267 (5th Cir. 1963); cf. General Motors Corporation v. Muncy, 367 F.2d 493 (5th Cir. 1966). In *Ford, supra,* the Plaintiff alleged a defective dimmer switch. Plaintiff had dimmed his lights for the approach of an oncoming car, as the car passed he hit his foot dimmer switch to return his headlights to bright but his lights went out altogether and caused him to run off the roadway and against a tree. A small pin in the switch was found to be broken. Plaintiffs' expert testimony said that a defect was in the switch when it was installed in the car, and that the pin had broken at the moment Plaintiff attempted to switch the lights. Further, it was said that the breakage could have caused all the lights to fail. Conversely, Ford's experts said that even with the pin broken there was no way the switch could cause all the lights to go out. Also they said that the pin could be broken only by the application of a large amount of pressure such as a head-on collision with a tree. The Court expressly held that the evidence was sufficient to warrant the finding that the defect was caused by the negligence of the supplier of the dimmer switch to Ford. Ford Motor Company v. Mathis, *supra,* note 18, 322 F.2d at 276.

 It is not necessary that the automobile be under the control of the Defendants at the precise time of the accident. Ozark v. Wichita Manor, *supra,* 252 F.2d at 675; accord, Bustamante v. Carborundum Company, 375 F. 2d 688 (7th Cir. 1967). The eight months and 2,920 miles between the date of purchase and the accident do not render the two so remote as to negate the

finding of a defect at the time Defendants surrendered control of the automobile. When the automobile left the control of Defendants it was in an inherently dangerous condition with an unreasonable risk of injury because of the defective cross linkage tube; a tube susceptible to failure even under normal driving conditions. There was no intervening force of such a magnitude as to cause the fracture in the tube. The defect was of a kind that would not ordinarily be present in a product at the time of delivery in the absence of negligence. Indeed, Defendants offered in evidence to show how well this type of cross linkage tube had held up over the years.

Thompson-Ramo-Woolridge, the supplier of the cross linkage tube to Defendants, receives the tube from yet another manufacturer and assembles the steering linkage system. A sample is taken from a batch of tubes and inspected and there is no final test of the assemblage before it is sent to Defendants. Defendants get the entire steering linkage assembly from the supplier and the parts are rarely tested at this juncture. After the automobile has been assembled completely it is put through a four to five minute "rolls" test, an operating inspection where the *feel* of the car is tested; admittedly, a defect in the tube would hardly be detected at this point. After the linkage system is assembled the protective cap around the hole in the tube where the ball stud fits would further prevent any visual inspection and detection of a fracture at this opening.

The inspection procedure was not sufficient to detect this defect in the cross linkage tube.

■ Defendants are liable not only for their own negligence but for the negligence of any of their component part manufacturers. Dow Drug Company v. Nieman, 57 Ohio App. 190, 13 N.E.2d 130 (1936); see Ford Motor Company v. Mathis, *supra;* Restatement (Second) of Torts, Section 400 (1963); Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908, 915 n. 27 (3rd Cir. 1948). The failure of Thompson-Ramo-Woolridge and Defendants to use ordinary care in assembling and inspecting the automobile and its parts caused the placing on the market of an automobile in an inherently dangerous condition due to its defective steering linkage.

■ As a proximate result of the accident, Mrs. Doreen Mosier received a scalp wound which has required her to wear a hair piece: this wound has resulted in physical impairment, pain and suffering, and emotional upset as alleged in Plaintiffs' petition. Thus, I find damages to Mrs. Mosier in the sum of $3500.00.

■ Dr. Benjamin Mosier alleges that because of the accident he suffered a painful injury to his neck and an aggravation of a colon condition which he had had for nine years prior to the accident. Because of these injuries he seeks recovery for loss of earnings, pain and suffering, and physical impairment. In light of his history of colitis, the causal connection between the accident and the "flareup" is somewhat dubious; there was, however, sufficient evidence of a painful neck injury (whiplash) and for the pain and suffering therefrom I find damages to Dr. Mosier in the sum of $2500.00.

■ Plaintiffs offered to show that because of the accident Marc Mosier suffers from psychomotor epilepsy. There was sufficient and uncontradicted evidence upon which to find that the epileptic condition resulted from the accident. There is the diagnosis and treatment of Dr. Paul Lensky and ample evidence of a change in Marc following the accident, a change that cannot merely be attributed to the childhood growing pains of a small boy. Dr. Lensky testified that the epileptic condition has persisted for approximately four years in spite of medication, and whenever Marc is taken off the medication, the symptoms become even more pronounced. Because the condition had persisted over several years,

Dr. Lensky was of the opinion that it was liable to persist for the rest of his life. The permanency of Marc Mosier's epileptic condition is amply attested by Dr. Lensky. His testimony was based on his observation of Marc since the accident and cannot be said to be insufficient and based merely upon guess and conjecture as Defendants contend.

For the physical impairment, pain and suffering, and loss of future earning capacity as a proximate result of the accident, I find damages to Marc Mosier in the amount of $60,000.00.

 Mr. Ben Hammerman, as executor of the Estate of Abraham Mintz, may recover for the conscious pain and suffering of Mr. Mintz, medical and hospital expenses, and loss of the automobile—all such claims having proximately resulted from the accident and survive the death of Mr. Mintz. Mr. Mintz was hospitalized for five days with painful injuries from the date of the accident to the date of his death. There was sufficient evidence that Mr. Mintz consciously suffered from acute and painful injuries during this five day period.

For the pain and suffering of Mr. Mintz I find damages to him in the sum of $10,000.00.

For the loss of the automobile I find damages to him in the sum of $1,035.00.

For the medical and hospital expenses of Mr. Mintz I find damages to him in the sum of $1,284.90.

As to the losses due the estate of Mr. Mintz for funeral expenses, I find damages in the sum of $1,035.77.

 The children of Mr. Mintz have not demonstrated that they have suffered a direct pecuniary loss because of the death of their father. The adult child-parent relationship in itself does not afford the presumption of a pecuniary loss. In re Estate of Cline, 202 N.E.2d 736 (P.Ct.1964); cf. In re Miller, 102 Ohio App. 493, 127 N.E.2d 409 (1955); see Karr v. Sixt, 146 Ohio St. 527, 67 N.E.2d 331 (Ohio 1946).

This memorandum opinion constitutes the Findings of Fact and Conclusions of Law of this Court.

The Attorney for the Plaintiffs will prepare an appropriate decree for entry. The clerk will send copies of the memorandum to all counsel.