MARGARET C. COURTOIS, GUARDIAN OF THE PERSON
AND PROPERTY OF CARROLL E. COURTOIS, AN IN-
COMPETENT, PLAINTIFF-APPELLANT, v. GENERAL
MOTORS CORPORATION, A DELAWARE CORPORATION,
DEFENDANT-RESPONDENT.

Argued April 2, 1962—Decided June 25, 1962.

*Mr. David I. Stepacoff* argued the cause for plaintiff-appellant (*Mr. Jay M. Hollander,* on the brief).

*Mr. Baruch S. Seidman* argued the cause for defendant-respondent (*Messrs. Burton, Seidman & Burton,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff, Margaret C. Courtois, brought this suit as guardian of her husband, Carroll E. Courtois, against defendant, General Motors Corporation, to recover damages

on account of serious head and other injuries suffered by him, which resulted in his mental incompetency. The claim against General Motors was predicated upon a charge of negligence in the manufacture of a certain tractor, and of breach of an implied warranty of merchantability of the tractor, a rear wheel of which came off and collided with a small truck being driven by Courtois. The trial court dismissed the cause of action based on warranty on the ground that Courtois was not a party to nor within the distributive chain created by the contract of sale between General Motors and the original purchaser of the tractor, and therefore could not sue for a breach of warranty arising from and incidental to that contract. In short, the injured man was regarded as a mere bystander, remote from the manufacturer of the tractor, who derived no rights from the contract of sale. The issue of General Motors' negligence was submitted to the jury, which returned a verdict for the defendant. We certified plaintiff's ensuing appeal from the adverse decision in both warranty and negligence claims before it was considered in the Appellate Division.

General Motors manufactures and distributes tractors. Between April and June 1951 it sold a new 1951 Diesel Tractor, Model 652, weighing approximately 10,000 pounds, to one Sam Coil of Washington Courthouse, Ohio. The tractor had large dual rubber-tired wheels on the rear. The wheel assembly consisted of the hub, the hub or axle flange into which 10 steel studs are pressed firmly so as to be immovable, the inner wheel disc and rim assembly, and the outer wheel disc and rim assembly. The wheels are placed so that the 10 studs project through 10 openings in the disc; then locking nuts are put on the 10 studs and tightened so as to produce a rigid, unitary assembly.

The locking nuts are tightened with a hand-manipulated wheel socket wrench, which is standard equipment for such a tractor. No one suggests that the tightening process is not easily accomplished by an ordinary individual. The "torque" (force applied) specification ranges from 260 foot

pounds to 350 foot pounds. The fact that such tightening is easily accomplished is emphasized by the Owners and Drivers Manual furnished with the vehicle, which says: "Always use regular wheel nut wrench to tighten wheel nuts or use torque wrench. Do not use an extension handle * * *." Use of an extension handle on the wrench magnifies the force applied in accordance with a scientific ratio, and the admonition against extending the handle obviously is to avoid the application of excessive tightening force to the nuts. Such excessive force, it is inescapably inferable, would have the tendency to adversely affect the threads and grooves on the nuts and studs. The warning against an extension handle is set forth in the Manual twice on the same page in different type print. Under the heading "Tightening Wheel Nuts," the following appears: "If regular wheel nut wrench equipment is used, do not use an extension handle * * *."

Tightening of the nuts anywhere within the range of 260 foot pounds to 350 foot pounds is satisfactory. Such tightening produces a high clamping force which holds the parts firmly together and causes the wheel and its associated parts to operate as an integral unit. The clamping force ranges from 18,000 to 27,000 pounds, depending on the degree of torque between 260 and 350 foot pounds that is applied to the stud nuts. That clamping force draws the wheel hub and drum into a single unit which will withstand "with ample reserve" any operational forces that may be applied in ordinary and expected use of the tractor.

Everyone conceded the importance of keeping the stud nuts properly tightened, within the range specified. A stud will break or fail only when a bending force is applied to it. If the nut on the stud is permitted to loosen (and it is undisputed that they do loosen with use of the tractor) the clamping force, which holds the wheel assembly in place as a unit, is lessened, thus allowing some foreign movement or oscillation which, in turn, permits the application of a bending force to the stud. The degree of the

bending force when the tractor is in operation, depends in large measure upon the extent of the looseness of the nut. And it is plain from the record that a nut could be loose enough to allow application of bending force to the stud without that looseness being observable on mere visual inspection. Proper maintenance requires regular testing and tightening with the standard torque wrench. If this abnormal bending force of varying degrees, depending on the looseness of the nut, is visited upon the stud constantly or at intervals during the life and use of the tractor, it will cause metal fatigue, and eventually an untimely and unnatural fracture of the stud. In other words, inadequate maintenance will cause the stud to wear out long before its time. According to one of defendant's experts, some tractors with proper maintenance have been known to last 10 years, and with such maintenance the studs should function as long as the tractor.

The importance of keeping the 10 stud nuts tight is emphasized in the Owners and Drivers Manual. It says in large type:

"WHEN TRUCK IS NEW OR AFTER EACH WHEEL REMOVAL."

Then in regular type:

"Tighten nuts DAILY for the first 500 miles of service to compensate for setting-in of clamping surfaces. * * *."

The necessity for maintaining proper stud nut tightness was fully recognized and accepted by plaintiff's principal expert. In speaking of such need whenever the wheels are removed, for a tire change for example, he said:

"Any time the entity is separated, where the two wheels have been taken from their original position and are reapplied, the roughness that had initially been compensated for by the tightening, subsequent tightening, is now reintroduced in the contact of the two members and just as in the initial production of the vehicle, the same situation again reappears and consequently must be taken into consideration by retightening after operation.

Q. In other words, proper maintenance of a truck requires that after the wheels have been removed, let us say for the purpose of putting new tires on it that when the wheel is replaced that care and attention be given to the tightening of the nuts, isn't that so?

A. Yes, sir. That's absolutely correct.

Q. And if those nuts are not properly tightened that would be an indication of improper maintenance, would it not?

A. If the nuts are not tight, yes, I agree with you, sir.

Q. And it is a requirement, isn't it, in case of a truck of this nature that when the wheels are replaced after tires are changed, let us say, that specific care and attention be given to the tightening of the nuts?

A. That's an Interstate Commerce Commission requirement, sir.

* * * * * * * *

Q. And if you don't do that, what happens?

A. Well, if you don't do that, you can produce any type of failure ultimately.

Q. What kind of failure?

A. You can produce a failure in the nuts, you can produce a failure in the wheel.

Q. In the studs?

A. And in the studs, yes, sir.

Q. And why is that? Why do you produce a failure in the studs, if you don't maintain the vehicle properly?

A. If you don't maintain the vehicle properly, and you permit operation under conditions as you are now suggesting, sir, additional forces are introduced which will, and of greater magnitude than normal and these will produce failure at a much earlier period."

Defendant's expert said that when stud nuts become loose, a lessening of the clamping pressure occurs. This release of pressure permits a kind of gapping movement in the wheel assembly which may be very slight or even imperceptible. Such movement allows a repetitive dynamic bending or flexing force of much greater magnitude than normal to be imposed on the stud bearing the loose nut and that force induces and hastens metal fatigue. Thus, he asserted, there is a definite relationship between inadequate maintenance of wheel assemblies and failure of studs.

The necessity for proper inspection and maintenance of tractors engaged in interstate transportation is recognized by the Interstate Commerce Commission. Its regulations require elaborate reports by drivers of their inspection and of the condition of such vehicles after each trip, as well

as systematic inspections and maintenance by the owner. These reports specifically call for the speedometer reading, inspection and maintenance of the speedometer, axle and wheel alignment, wheels, rims and tires. Moreover, while on an interstate trip (exceeding a radius of 50 miles), the driver is required to keep a daily log on a prescribed form showing his driving hours (limited to 10 hours in the aggregate in any period of 24 consecutive hours) and the total mileage covered during each day. See, 49 *C. F. R.* §§ 195, 196.

As has been said, this tractor was sold between April and June 1951 to Sam Coil of Washington Courthouse, Ohio. He was called as a witness by plaintiff and testified that according to his records, during the first 45,000 miles of operation nothing was done to the tractor except oil change and greasing and change of the fuel filters and air cleaners twice. The only reason he gave for selecting the first 45,000 miles (about five months) of travel for discussion was that plaintiff's counsel had asked him to check his records for that mileage. So he came prepared to testify only with respect to his maintenance for that limited operation. When asked to describe his maintenance for the first 100,000 miles, all he could say was that he "didn't check it [presumably his record] real good." It may be noted that he did not say that the stud nuts had been tightened daily for the first 500 miles of travel. Nor did he assert that at intervals or, in fact, at any time during the period of his ownership and operation of the tractor, he inspected the stud nuts or had them tested as routine maintenance, in a manner which would reveal any loosening. This omission cannot be ignored, because it seems clear from the record that loosening of the stud nuts does occur as an incident of ordinary operation.

Coil owned and used the tractor until September 28, 1953, by which time it had accumulated mileage of 250,000 to 300,000 miles. In the intervening period, he had replaced the tires four times and relined the brakes once or twice. In

these instances, of course, the wheels were removed, which necessitated taking the stud nuts off and putting them back on when the work was completed. No testimony was offered to establish that on resumption of road operation after the relining of the brakes and replacement of the wheels, the stud nuts were checked daily for 500 miles to make certain they remained tight in their new clamping position and thus allowed no bending force to be imposed on the studs.

After the tractor had been driven 37,000 miles, one Arthur Brightman took over the driving, and he operated it exclusively until Coil sold it. He said that after new tires were put on he would check the studs with a wrench every 25 miles for 100 miles to see if they were tight, and "maybe twice after a tire was put on" he would have occasion to tighten the nuts. Except for that 100-mile travel, he would just look at the wheels and nuts whenever he "stopped for coffee or anything like that."

On September 28, 1953 Coil sold the tractor with its mileage of 250,000 to 300,000 miles to Arthur Reiber, who retained ownership thereafter until the accident in question. Just before the sale, the motor, transmission and read end were overhauled, and, according to Coil, the vehicle was in good condition. During his ownership, none of the wheel studs had been replaced or repaired.

Reiber, a resident of Washington Courthouse, Ohio, is in the interstate livestock trucking business. He, too, like Coil, was subject to the motor vehicle safety rules and regulations of the Interstate Commerce Commission. However, he never made or kept any of the required inspection and maintenance reports; nor did the driver of the tractor involved here, make or keep the inspection and maintenance reports required of him. Reiber said that after purchase from Coil, he inspected and maintained the tractor himself before it went out on a trip and upon its return. He would take a wrench and check the lugs on the studs. Every 15,000 miles or so he would engage in a preventive

maintenance inspection, including a check of the nuts on the wheel studs. This check would be made by using a lug wrench with a length of pipe extention of three to three and a half feet added to it. Use of such an extension, as has been indicated above, is advised against in the Owners and Drivers Manual, because of the sharp increase in tightening pressure that is generated thereby. Occasionally, Reiber would find the nuts sufficiently loose to require tightening. But in the more than three years of his ownership of the tractor before the accident, no studs had been replaced or repaired.

· The evidence indicates that for almost two years at least before this accident, the mileage registration part of the speedometer had not been working. For that reason Fred Michael, Jr., who drove the tractor exclusively since early 1955, could not give the mileage on December 31, 1956, the date of the accident. Reiber estimated that he had added 250,000 to 300,000 miles between September 28, 1953 and the date of the accident, thus bringing the total mileage on December 31, 1956, to 500,000 to 600,000 miles at least. During Reiber's ownership, the tires were changed three or four times, of course necessitating removal and replacement of· the wheels and stud nuts. In that period there was a time when steering of the tractor was difficult; another time there was too much play in the steering wheel; on occasion the front wheels had to be balanced to prevent vibration. In this connection, Reiber said, "lots of times the driver will say that it doesn't feel right," and then he would have the wheels checked, balanced and re-aligned. Three or four months before the present accident, the motor blew up on the road, making it necessary to have the tractor towed in and the engine overhauled. According to the driver, Michael, he had occasion to have some wheel studs cleaned by Byers Motor Sales, Columbus, Ohio. When this was done he did not know, nor did he say what studs were involved or what was done, or why it was necessary or why he could not have cleaned them himself.

In May 1956 the four rear tires were replaced, again necessitating removal of the wheels and stud nuts. Reiber testified that the tractor was in good condition on or about December 30, 1956, when it left his place in Ohio.

On December 30, 1956, at 1 A. M., Michael started out from Washington Courthouse, Ohio, for North Bergen, New Jersey. He was driving the tractor in question, which had attached to it a 34-foot Fruehauf tandem trailer weighing approximately 11,000 pounds. The trailer was loaded with 125 to 135 hogs weighing about 26,000 pounds. The gross capacity of the tractor was approximately 55,000 pounds. He reached Hamburg, Pennsylvania, at 3 A. M., December 31, and stopped for a 45-minute rest and coffee. Before proceeding, he kicked the tires to see if they were inflated and looked at the studs, noticing that all 10 of them were on each wheel of the tractor.

While proceeding at 40 to 45 miles per hour, along Route 22 in Greenbrook Township, Somerset County, New Jersey, about 85 miles from Hamburg, at about 6 A. M., he felt a vibration in the rear and applied his brakes. As the tractor and trailer slowed, the outside right rear wheel, which had become disengaged, rolled by, passed in front of his vehicle and across the roadway. It struck the center island, bounced in the air, and collided with the left front side of the Dugan Bros. bakery truck which was being driven in the opposite direction by Carroll E. Courtois. As a result, Courtois suffered severe injuries which ultimately produced such mental incapacity as required the appointment of his wife, Margaret C. Courtois, the plaintiff, as guardian.

A few days after the accident the tractor wheel was found on the side of the roadway. The Dugan Bros., Inc. truck maintenance superintendent was notified about the accident very shortly after it happened and drove to the scene. There, while examining his company's vehicle, he found under the seat pedestal part of one broken stud with the nut still affixed. It was identified as one of the 10

studs of Reiber's tractor. This witness, whose occupation undoubtedly gave him some experience with studs and bolts and metal parts of motor vehicles, furnished a graphic description of the broken stud. He said it looked as if it was worn and shiny a third of the way through, as if something had been "working on it or rubbing on it." The shiny part extended from the outer circumference of the stud, down one-third of the way through. At the end of the shiny part, the metal had a step-like appearance and the fracture for the remainder of the stud seemed like a more or less clean break. The testimony in this respect is reasonably susceptible of the impression that the stud had been subjected to some foreign outside pressure which wore or cut one-third of the way at which time it was subjected to a bending force which it could not withstand and so caused a complete fracture.

After the mishap, the tractor was taken to a garage in New Brunswick, New Jersey. There it appeared that all 10 of the wheel studs had broken off. No broken outside fragment of any one of them, either with or without the locking nut, was found or recovered, except the one described above. Where or when, or for what reason, or in what sequence the other nine broke, has never been explained. A new wheel was put on the tractor, apparently at the New Brunswick garage. Ultimately Michael drove the tractor with the new wheel on it back to Washington Courthouse, Ohio, arriving there on January 3, 1957. What happened to the wheel assembly bearing the 10 broken studs was not shown. No one from the New Brunswick garage or connected in any way with Reiber was produced to explain what became of the part of the damaged wheel assembly which remained with the hub, or specifically what condition that part of the wheel was in, or the condition of the portions of the studs which remained affixed to the wheel unit, or whether the break of the nine studs was actually due to defective studs or to a defect in them traceable to the manufacturer, or to fatigue caused by improper

maintenance by an owner. The present suit against the manufacturer was not instituted until December 30, 1958, one day before the statute of limitations expired, and no one suggests that General Motors or any of its representatives ever saw or had the opportunity to examine and test this remaining part of the wheel assembly, or the portions of the broken studs still imbedded therein.

At this point it may be appropriate to note that in September 1957 suit was instituted in the Superior Court, Law Division, by Carroll E. Courtois, as plaintiff, against Arthur H. Reiber and Fred Michael, Jr., owner and driver of the tractor, as defendants, to recover damages for his injuries. Although the complaint was not received in evidence, manifestly the action had to be predicated on some default of Michael or Reiber, or both, in connection with the operation or maintenance of the tractor. The cause was transferred to the United States District Court because of the diversity of citizenship. Mrs. Courtois was appointed guardian *ad litem* on account of Courtois' incompetency, and subsequently she settled the case for $47,500, which settlement was approved by the Federal Court and judgment entered against Reiber and Michael. That judgment was paid.

At this trial the single piece of a broken stud with the nut attached was introduced in evidence, and plaintiff's case for recovery of damages rested entirely upon opinion evidence with respect to its condition. There is no dispute that certain elements are employed in the fabrication of steel for studs of this type: iron, nickel, manganese, sulphur, phosphorus, silicone, chromium, carbon and molybdenum. It is likewise undisputed that analysis of the broken stud showed that those elements in proper proportion had been used in its fabrication, and that such composition is standard for a high-strength, hardenable steel. Upon the completion of any steel fabrication process, the end product always contains some minute nonmetallic inclusions distributed throughout the finished metal. Such

inclusions are regarded as indigenous to the product and the steel is classified for use in accordance with the content of nonmetallic inclusions. The manual of the American Society for the Testing of Materials has established five grades of steel on the basis of inclusion content. Grade 4 is used in the automobile industry for the purpose of tractor wheel assembly of the kind involved here.

Although the experts on both sides of the case are in disagreement on a number of their conclusions, the basic controversy among them concerns itself not about the quantity of nonmetallic inclusions but rather about their diffusion in the one broken stud in evidence. Plaintiff's experts claimed their test (the manner of performance of which was challenged by defendant's experts) revealed that in the fabrication of the steel in the one stud they examined, the inclusions had become concentrated in too great quantity at the site of the fracture, rather than diffused in the normal Grade 4 pattern throughout the product. That condition, they said, weakened the stud and made it more susceptible to fatigue and early or easier fracture upon the application of bending forces.

Their further proof was to the effect that the break in the stud was in part a fatigue fracture resulting from "repeated stresses"; the rest was a shock fracture which came about when the fracture lines extended through the stud to the point where the metal was incapable of withstanding the stress load. When that point was reached, the break suddenly became complete and the stud separated into two pieces. These witnesses said also that a stud containing unduly localized inclusions would wear out sooner than a normal one, and if it were subjected to excessive operational bending stresses because of improper maintenance of the lock nuts, the fatigue fracture point would be reached at an earlier time.

Defendant's experts denied the undue concentration of inclusions at the site of fracture. They maintained that the inclusion content and diffusion thereof appeared normal,

that the fracture could not be charged to any such defect, and that, in fact, there was no defect at all in the stud. They said that in the normal operation of the tractor with maintenance of the proper range of tightness of the stud, it would not be subjected to any bending force which would cause it to break. But if its locking nut were permitted to relax beyond the low point of the torque specification, then in ordinary use of the tractor, bending forces would be applied to the stud causing it to suffer excessive metal fatigue and come to a premature end of its service life.

■ General Motors buys this type of wheel assembly from Motor Wheel Corporation. On delivery to General Motors, the studs are already impressed into the wheel hub. Motor Wheel buys the studs in sizable quantities from two manufacturing suppliers, Lundberg Screw Co. and Michigan Screw Co. Obviously, neither General Motors nor Motor Wheel Corporation would know whether the 10 studs in every wheel assembly were fabricated at the same time or from the same batch of materials. In any event, General Motors is under a duty to make a reasonable inspection for defective studs. *Martin v. Studebaker Corp.*, 102 *N. J. L.* 612 (*E. & A.* 1926); *Pabon v. Hackensack Auto Sales, Inc.*, 63 *N. J. Super.* 476 (*App. Div.* 1960). Proof was adduced to show that its inspection techniques were inadequate and the trial court concluded that a jury question as to its negligence in that respect was made out. Defendant criticizes this ruling as erroneous but, in view of the result we have reached, there is no need to consider the problem.

A long hypothetical question was put to plaintiff's experts, in which, among other things, the tractor and the accident were described; they were asked to assume also the alleged excessive concentration of nonmetallic inclusions at the site of fracture of the one stud, as disclosed by the tests, and that about 85 miles from the scene of the accident, the driver had checked the wheel in question and found it in "normal condition and all ten studs and the nuts

thereon * * * properly in place." The question concluded by asking if the witness had any opinion as to "what caused the wheel to come free from the tractor * * *?" The answer given was that the wheel came free as a result of the successive fracturing of the wheel studs until the last one let go and thereby released the wheel. The answers given were based upon a factual assumption which was not in evidence, *i. e.*, that all 10 of the studs, or enough of them to make it impossible to sustain the operational tractor load, were defective, thus causing all 10 of them to fracture and permit the wheel to come off. In other words, because the witnesses' examination of the single fractured stud allegedly disclosed to them excessive nonmetallic inclusions at the site of fracture, they concluded that all 10 of the studs were likewise defective, or that a sufficient number of them were likewise infected with excessive inclusions, so as to cause their fracture and produce the disengagement of the wheel.

One of the plaintiff's experts appeared to recognize the weakness of their position. When the hypothetical question was put to him, he stated that "the excessive amount of inclusions in the stud caused the stud to break" and in turn caused the wheel "to come off." On cross-examination, the following inquiry indicates his difficulty:

"Q. Didn't I ask you the question as to whether you formed any conclusion as to what caused this wheel to come off this truck?

A. No. Then I think we went back and I asked you to rephrase the question to refer to the stud only.

Q. Well, I will ask you the question directly now?

A. Yes.

Q. Did you form an opinion based upon the hypothetical question as to what caused this wheel to come off the truck?

A. Yes. The breaking of the stud then would allow the wheel to come off.

Q. All right. The first step would be the breaking of the stud, is that correct?

A. Yes.

Q. What happened after the studs broke. What was the next sequence before the wheel came off?

A. The wheel just has to slide off.

Q. Well, there are ten studs?
A. Yes.
Q. You have got one.
A. Yes.
Q. I want to know what happened after this stud broke.
A. Since this was the only stud that was given to me, and I understand further that the other studs were not available, that this was the only stud that was found, I would then have to incorporate in my thinking that this was one of the last studs. The others must have failed previously.
Q. But those studs you did not see?
A. That is correct.
Q. Those studs you did not examine?
A. That is correct.
Q. And what you are talking about is one of the last studs that broke?
A. That is correct.
Q. And that's all that you can say?
A. Yes."

Basically, the trial court decided there was a factual issue as to defendant's negligence for determination by the jury for two reasons: (1) plaintiff's expert testimony as to undue concentration of nonmetallic inclusions at the point of fracture of the single broken stud introduced in evidence, and (2) the expert testimony that the excessive inclusions could have been discovered if General Motors had made a reasonably careful inspection of it when received as part of the wheel assembly unit and before the unit was incorporated into and made part of the tractor. As has been indicated, the jury found in favor of the defendant, and no charge is made that the record does not support the verdict. It is argued that certain erroneous statements were made in the charge to the jury. Not only were no objections interposed by plaintiff, but in any event, since we have concluded that the matter should not have been submitted to the jury at all, it cannot be said that any prejudice was suffered.

The primary question on this appeal is whether the record contains sufficient proof of breach of an implied warranty of merchantability of the tractor, and that such breach was

a proximate cause of the detachment of the wheel, to create a factual issue for determination by the jury.

 In order to establish a breach of such a warranty it is necessary, of course, to establish a defect indicating that the tractor was not reasonably fit for the general purpose for which it was sold. Obviously, if the studs, by means of which the heavy wheels were affixed to the tractor, contained nonmetallic impurities in such quantity or so localized as to make them susceptible to fracture, under normal operating conditions and in spite of due care in maintenance, in less than their reasonably expected service life, lack of merchantability would be indicated. Neither proof of negligence in manufacture or in inspection is necessary. *Henningsen v. Bloomfield Motors, Inc.*, 32 N. J. 358, 372 (1960). It is immaterial in connection with a claim of breach of implied warranty of merchantability that a manufacturer, such as General Motors, incorporates in the completed vehicle parts or assemblies which are purchased from another manufacturer. The warranty runs from the manufacturer who markets the completed unit. If the breach results from a defect in a constituent part made by someone else, the public interest can be served and protected only by holding the manufacturer who completes, assembles and markets the vehicle in final form for consumer use, and by leaving him to a remedy over against his supplier. Proof of a defect, however, is not alone sufficient to justify a recovery of damages; it must appear also that the defect was an efficient, producing cause of the mishap. *Henningsen, supra,* at p. 409; *Gillam, Products Liability in the Automobile Industry* (1960). 206. Plaintiff's burden, therefore, is to provide proof of a defect in the wheel assembly of this tractor of such influence or consequence as to be capable of constituting an efficient cause of the detachment of the wheel, and further that such defect was in fact an efficient producing cause thereof. In the absence of such evidence, the charge of breach of warranty is not sustained and the manufacturer cannot be held responsible.

■■■ We are concerned here with a heavy 1951 tractor. It was about five and one-half years old at the time of the accident, and during that period had been driven from 500,000 to 600,000 miles, obviously on long, interstate runs. The mileage may well have been greater because it is known that for about two years at least before this accident, the mileage recording part of the speedometer had not been functioning. Moreover, the Interstate Commerce Commission requirements for inspection and maintenance reports were not complied with at any time during the life of the tractor, and there is serious doubt as to the quality of its maintenance, including the wheel assemblies, studs and nuts. It must be remembered that the implied warranty of merchantability means that the article is reasonably fit for the purpose for which it is sold. Absolute perfection is not implied. There is no duty on the part of a manufacturer to furnish a tractor which will not wear out. The knowledge is universal that manufactured articles which depend upon moving parts for their productive use, will eventually suffer fatigue and wear out. Further, as the proof here indicates beyond question, the length of service life of metal parts depends in some measure upon proper maintenance. Parts which are subjected to abnormal stresses and strains, such as bending forces in this case, because of inadequate maintenance, cannot be expected to live out their normal service life, that is, the length of time for which they are designed to be serviceable for the intended use, and for which they may reasonably be expected to be serviceable if properly made.

As has already been described, the rear wheel in question was made up of the outer wheel disc and rim assembly. When the wheel is attached the 10 studs, which are imbedded in the hub flange, project through the 10 openings in the heavy metal disc (the assembly, apparently without the tire, weighed 90 pounds). Then the nuts are tightened down on the studs, holding the disc and the wheel firmly in place, thus providing unitary operation of wheel, · hub and axle,

and investing the assembly with a very substantial margin of safety for normal operational loads.

All the witnesses agreed that if the lock nuts were not kept within the proper range of tightness, bending forces would be exerted on the studs. It follows, of course, that the looser the nuts became, the greater the bending force; also, the longer the looseness persisted, the sooner metal fatigue would follow. So throughout the years of use and the very substantial mileage covered by the tractor, every time the nuts on this wheel became loose, and until the condition was rectified, abnormal fatigue-inducing forces were being applied. There is no doubt that recurring looseness was a concomitant of operation over the highways. The I.C.C. safety regulations for regular inspection and maintenance of tractor wheels obviously stem from recognition of that fact. Additionally, every time the tire was changed or the brakes relined, requiring removal and replacement of the stud nuts and wheel, it was not only necessary to tighten the nuts to the proper torque, but because (as the experts agreed) they were more susceptible to reloosening during the first 500 miles of operation thereafter, it was essential to retighten them daily. The proof revealed that the tire on this wheel was changed about eight times and the brakes relined at least twice between 1951 and the date of this accident. There is no specific proof that the 500-mile rule was observed. One driver said after tire changes he tightened the nuts every 25 miles for the first 100 miles. Obviously, if an operator could not be certain that the nuts had seated themselves sufficiently in the new position until after 500 miles of operation, frequent attention in the first 100 miles would fall short of satisfying the need which, according to experience and scientific knowledge, would be present and if not satisfied would result in bending force on the studs. And in this connection, defendant's expert's testimony stands undisputed that absence of proper degree of tightness could not be detected simply by looking at the nuts.

One aspect of this problem is clear. No one can say what actually caused at least 9 of the 10 studs to shear off, or when or where, between Hamburg, Pennsylvania, and the place of accident, or how or in what sequence they broke. This deficiency in the proof cannot be charged to General Motors. Reiber's driver and the garage where the new wheel was installed apparently within a day after the accident, had possession of the hub flange with the remaining portions of the broken studs embedded in it. So far as the record shows, there was no lack of opportunity for study and analysis of them. Michael was asked if he bought the 10 new studs to replace the broken ones in the hub flange. He said he could not remember. Neither he nor anyone else offered any statement as to what happened to the damaged ones when they were removed in order to substitute the new ones. In fact, it is not clear whether they were removed and replaced by new ones, or whether an entirely new right rear wheel assembly was put on the tractor. In view of the serious nature of the injuries involved, it is difficult to accept the notion that no study of them was made. But the plaintiff, who had Reiber's cooperation in the present suit, left the matter without explanation.

Thus, the plaintiff's case stands or falls on the evidence respecting the condition of the one nut-bearing piece of a broken stud. No one can say or has said when this stud broke in relation to the other nine. One of plaintiff's experts assumed, without explanation of his reason, that it was one of the last to fracture. But if that were so it would strongly militate against plaintiff's claim because no one would reasonably expect the last stud or last few studs, irrespective of their normalcy, to withstand the entire operational load of the tractor.

Although it may be said that a factual issue existed at the trial as to whether the one fractured stud was defectively fabricated, that proof, looked at in the most favorable light to the plaintiff, cannot be said to support an

inference that the other nine studs, or enough of them to be a producing factor in the disengagement of the wheel, were similarly defective. Such an inference would be founded on speculation or conjecture. As has been shown, Motor Wheel Corporation bought studs in substantial quantities, up to 500 at a time, from two manufacturers. After purchase and spot check for condition, 10 studs would be imbedded in each wheel disc in a "bolt circle" and thereafter the wheel assembly, already described, would be sold. and delivered to General Motors. There is nothing to show or to suggest that the 10 bolts on the wheel involved in this case were fabricated at the same time or under the same conditions, or came from the same batch of components, or from the same sections or rolls or strips of finished steel. Under the circumstances, it would be pure supposition on the record before us to conclude that a deficiency in the composition of one stud would be representative or characteristic of the other nine studs in the bolt circle. For all the record reveals, the 10 studs in Reiber's wheel may have been made at widely variant times and from steel ingots or rolls made on different occasions.

The speculative nature of the inference advocated by plaintiff may be further explained. The one stud in evidence was said to be defective because of an excess concentration of nonmetallic inclusions at the place of fracture. There is agreement that some nonmetallic inclusions are native to all steel. However, in the fabrication process, these extremely minute impurities diffuse themselves naturally throughout the steel. Although the evidence is not entirely clear, it would appear that if materials, including some chemicals, in standard quantities go into the making of a certain grade of steel (and the stud in question shows standard components), the result would normally contain a certain amount of inclusions scattered throughout the product. If, by some fortuitous circumstance, an undue concentration of the inclusions occurs at some area of the product, it would seem to follow that the inclusions through-

out the remainder of that batch of steel would be less than usual. In any event, proof that somehow in the fabrication process an overconcentration of such nonmetallics inexplicably occurred at the site of fracture of one stud, would not support an inference that the same condition occurred throughout the steel from which the stud came, or from which the other nine studs were taken. And certainly, in the absence of evidence that the other nine studs came from the same steel, the condition of the one defective stud would have no probative value with respect to their inclusion content or its state of diffusion.

Our analysis of the record leads us to conclude that the evidence of the defective condition of one of the 10 studs on the tractor wheel is insufficient to create (1) an inference that it was an efficient producing cause of the detachment of the wheel, or (2) an inference that the other nine studs, or a sufficient number of them, were similarly defective and proximately caused the wheel to leave the tractor, or (3) that there was such a defect in the wheel assembly as to constitute an actionable breach of defendant's implied warranty of merchantability of the tractor. Under these circumstances, defendant was on sound ground in making the motion for judgment in its favor because of failure to create a jury question on the claim of breach of warranty. It follows also from all the foregoing that on the negligence count the proof with respect to inadequate testing by General Motors of the single stud in evidence (if accepted) was insufficient to make a jury question as to whether such lack of care was an efficient producing cause of the accident. Since the jury found for the defendant on that score, however, the error of the court was not prejudicial.

Our determination that no cause of action was established for breach of implied warranty removes from present consideration the problem whether a third person, situated as was Courtois, may maintain an action on the warranty. We agree that it was not specifically disposed of in

*Henningsen,* and it is reserved for disposition at an appropriate time.

◼ Finally, we feel that comment should be made on the treatment in the trial court of the $47,500 settlement of Courtois' claim in the United States District Court against Michael and Reiber. General Motors was not a party to that action or judgment, nor was it referred to in any of the closing papers disposing of the matter. Mrs. Courtois testified she had no intention of releasing or discharging her husband's claim against General Motors. There was no countervailing proof or contrary inferences. In spite of this state of the record, the trial court submitted to the jury for determination the question whether she intended to accept the $47,500 in full settlement of her husband's case against all parties, including the manufacturer of the tractor. On the evidence adduced this was error. There was no factual dispute which permitted or required the intervention of the jury. The court should have dismissed the defense as a matter of law. See *Daily v. Somberg,* 28 *N. J.* 372 (1958). But in view of the absence of a cause of action against General Motors, as we have found, plaintiff suffered no harm by the trial court's action.

For the reasons stated, the judgment for the defendant is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.