**FORD MOTOR COMPANY, Appellant,**

v.

**Marvin R. MATHIS, Appellee.**

**No. 20135.**

United States Court of Appeals
Fifth Circuit.

Sept. 4, 1963.

Cameron, Circuit Judge, dissented.

Virgil T. Seaberry, Jr., Eastland, Tex., for appellant.

Frank Scarborough, Abilene, Tex., for appellee.

Before CAMERON and BROWN, Circuit Judges, and WHITEHURST, District Judge.

JOHN R. BROWN, Circuit Judge.

We here deal primarily with the liability of an assembler-manufacturer for injuries caused by identifiable defects in a component part negligently produced by an independent supplier. Writing with an *Erie*-Texas pen, it might be that, as of old, the Moving Finger writes, and having writ, moves on. But it may be that having written, what we write is soon erased. This is not the last word, only the latest. And before the slug drops in a St. Paul linotype, the first writing Texas court may melt down the lead to so much dross. Such are the perils of diversity jurisdiction.[1]

The basic problem is presented by the questions of whether there is sufficient

---

1. The mortality rate may be high. See Smoot v. State Farm Mutual Automobile Ins. Co., 5 Cir., 1962, 299 F.2d 525, 529, note 9:

"9. See, e. g., National Surety Corp. v. Bellah, 5 Cir., 1957, 245 F.2d 936,. which the Texas Supreme Court expressly declined to follow. Truck Ins. Exchange v. Seelbach, Tex.Sup.Ct., 1960, [161 Tex. 250] 339 S.W.2d 521, 525. In Food Fair Stores, Inc. v. Trusell, Fla.Sup.Ct., 1961, 131 So.2d 730, 733,

evidence to support the jury verdict and whether the Judge erred in his instructions to the jury. An additional and perhaps controlling question is whether the jury's answer to a particular interrogatory precludes Plaintiff's recovery. A careful review of the record and applicable state law convinces us that the Judge's charge was in conformity with the law, that the verdict is amply supported in the evidence, and that the Plaintiff is not precluded from recovery. The judgment is accordingly affirmed.

Plaintiff purchased a new 1961 Ford Sunliner convertible from an authorized Ford dealer in San Benito, Texas. Thirteen days and some 1795 miles later, while Plaintiff was travelling alone from his home in Sagerton, Texas to his Air Force duty station in Mississippi, the accident occurred which is the subject matter of this suit. Plaintiff testified that the accident occurred at about 10:00 p. m. He was driving at a normal rate of speed considering the time, weather, and road condition. He was not sleepy and had not gone to sleep at the wheel. Rather, fully awake and alert, he was driving around 55 to 60 m. p. h. on a straight stretch of road and met an oncoming car. Plaintiff dimmed his lights by use of the foot dimmer switch. As the other car passed, Plaintiff hit the dimmer switch to return his lights to bright. Instead of returning to bright, the headlights went out altogether. Immediately, he decreased speed, but felt the car edge off the road and onto an incline. He kept flicking the dimmer switch with his foot in an attempt to get some light. Eventually, in the near eternity of these fleeting seconds, the lights returned at a time when the car was about 20 feet from a tree. He applied immediate pressure to the brakes and braced himself for the resulting impact. The car hit the tree. There it stopped. Not surprisingly, Plaintiff received substantial injury to his person and damage to the automobile, as well as several items of personal property which he was transporting in the trunk of the car. Plaintiff instituted this suit against Ford Motor Company in the District Court seeking damages for these personal injuries and property losses. From a jury verdict and judgment entered thereon in favor of Plaintiff, Ford has appealed.

■ At the outset it is important to once again emphasize that in this diversity-*Erie*-Texas action we are bound by the applicable Texas law as we divine it today, not what it might be tomorrow. Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 583.

■ In its multi-count brief containing thirty-five points of error, Ford asserts that the evidence is not sufficient to support the verdict. We disagree, as did the Court below in overruling Ford's motions for instructed verdict, j. n. o. v., and for a new trial. Plaintiff's case was initially predicated upon alternative theories of breach of warranty and negligence. However, at the trial, Plaintiff apparently abandoned the express warranty aspects and relied on his negligence theory, although as always in these cases, language is used suggesting so-called implied warranties or similar concepts. It was under the negligence approach that the case was submitted to the jury. This forms the basis of the jury's verdict un-

the Florida Supreme Court gave our Pogue v. Great Atlantic & Pacific Tea Co., 5 Cir., 1957, 242 F.2d 575, a somewhat similar treatment." To these may be added Barnes v. Pennsylvania Threshermen & Farmers' Mutual Casualty Ins. Co., Fla.App., 1962, 146 So. 2d 119, in which Florida rejects another decision of this Court, Maryland Casualty Co. v. Hallatt, 5 Cir., 1961, 295 F.2d 64.
And in the undulating field of products liability Florida has again registered its

authoritative disagreement. Green v. American Tobacco Co., 1963, Fla., 154 So.2d 169, answering questions certified by us, 1962, 304 F.2d 70, 85, in effect reversing our earlier holding, 1962, 304 F.2d 70. What the fate of our recent decisions for Mississippi and Louisiana will be, only time, tide and litigation will tell. Grey v. Hayes-Sammons Chemical Co., 5 Cir., 1962, 310 F.2d 291 (Mississippi); Lartigue v. R. J. Reynolds Tobacco Co., 5 Cir., 1963, 317 F.2d 19 (Louisiana).

der special interrogatories, F.R.Civ.P. 49, the use of which we have so often extolled,[2] and which here excise for critical examination specific findings bearing on liability theories.

In the beginning, two things are significant. First is the fact that the dimmer switch in controversy was not manufactured by Ford, but by an independent supplier to Ford who is not a party to this suit. The second is that an identifiable defect in the dimmer switch was established.

Unlike so many of these cases where from ineptness, lack of resourcefulness, or sometimes the destruction of all means of knowledge, legal theories are orbited to an unheard of apogee, in this case facts, both actual and expert, were fully proved. The Plaintiff carefully negatived misuse or knowledge of any defect. He testified that from the time he purchased the car until the accident, he had done some night driving and had used his dimmer switch in the customary manner and that it had functioned normally. However, that at the time of the accident, his lights failed completely when he attempted to switch them from dim back to bright. Next the defect was affirmatively proved. It is undisputed that following the accident examination of the switch disclosed a small pin to be broken. This pin would have an effect upon the switching of the lights from bright to dim and vice versa. The mechanical-operational consequence of the defect was the subject of competing credible evidence. The testimony of Ford's experts was that the switch was so designed and manufactured that even with the broken pin, there was *no* way the switch could cause all the lights to go out. The Plaintiff's expert testified that he had examined and tested the switch, and that during the tests he conducted, the lights flickered several times and on one or two occasions they stayed off for several seconds. This testimony was substantiated by one of Ford's experts who was present

at this testing. Plaintiff's expert further testified that in his opinion, a defect was in the switch when installed in the car, that the pin had broken when Plaintiff attemped to switch his lights, and that this breakage could have caused all the lights to fail.

Ford's experts testified to the contrary. They testified at length about the actual manufacture of switches and the various tests to which each switch or its components was subjected in the supplier's factory. Although each part of each switch was visually inspected during the manufacturing process, only a few random selected switches were subjected to the rigorous tests which they described. In one respect they were unequivocal. Without exception, these experts stated that a defective switch could not come out of the supplier's plant. And it was their opinion that the pin could only be sheared off by an extreme amount of pressure such as might result from a head-on collision of a car with a tree, particularly if the driver had his foot on the switch at the moment of impact.

So far as inspection by Ford is concerned this was largely visual plus assembly line test operations after installation in the car and during adjustment of headlights. Of course the switch on receipt from the supplier was assembled and ready for installation, and no effort was made, either as to all or random selections, to open up the switches for more minute inspection.

■■ Plaintiff had his theory of how the accident happened. He flatly denied that he had gone to sleep and run off the road. His evidence, factual and expert, showed the dimmer switch was faulty when the car was placed on the market by Ford, and that this defect ultimately caused the failure of the lights. Ford's evidence was to the contrary. It is not our function to determine which side has produced the heavier evidence. Once the Court has determined that the Plaintiff has brought forward sufficient evi-

2. E. g., Delta Engineering Corp. v. Scott, 5 Cir., 1963, 322 F.2d 11; Tugwell v. A. F. Klaveness & Co., 5 Cir., 1963, 320 F.2d 866, note 2.

dence to warrant jury submission, it then becomes the function of the jury to strike the balance between the parties. Employers Mutual Casualty Co. of Des Moines v. Mosqueda, 5 Cir., 1963, 317 F.2d 609.

The special questions pinpointed both fault and our legal problems. The jury found that when the automobile left the possession of Ford it was "inherently dangerous" causing an unreasonable risk of injury because of the defective dimmer switch.[3] Next, it fixed responsibility for the defective switch by finding the manufacturer-supplier negligent in its production.[4] It then focused the legal problem by finding that Ford as the assembler could not have discovered the defective switch during the course of a reasonable inspection.[5] But it found that Ford was negligent in putting the car on the market in the condition then existing[6] and that this was a proximate cause of the accident.[7]

■ Ford contends that the jury finding that Ford's employees could not have discovered the defective dimmer switch by reasonable inspection (see note 5, supra) precludes recovery by Plaintiff on the negligence theory. We disagree. Our discussion of this point and the

Texas law concerning products liability will also dispose of Ford's additionally assigned errors that the Judge erred in jury charges given and refused.

■ At the outset, it is well to point out that we have not found, nor have we been cited to, any Texas case directly in point. The case of S. Blickman, Inc. v. Chilton, Tex.Civ.App., 1938, 114 S.W.2d 646, with its lengthy discussion of legal principles we believe to be applicable here does afford a lantern as we make our *Erie* way. In that case, the injured plaintiff fell off a defective bar stool in a hotel fountain area. However, he sued the independent contractor who was remodeling the hotel at the time. The Court held that the ordinary defenses of an independent contractor were inapplicable because at the time the hotel engaged the contractor to conduct the repairs, the contractor represented the bar stools to be a "fabrication of their own factory" even though in fact they were manufactured by a third person. The Court said that regardless of whether the stools were actually manufactured by the contractor or not, "having furnished them as their own product and so represented them, [the contractor] would be held to the same rule of liability as if it had manufactured them itself."[8] 114

---

3. "Question No. 1:
 "Do you find * * * that at the time the automobile * * * left the control of [Ford], it was in an inherently dangerous condition, due to the condition of the dimmer switch, calculated to cause an unreasonable risk of injury * * *? * * *
 "Answer: It was in an inherently dangerous condition."

4. "Question No. 2:
 "Do you find * * * that such inherently dangerous condition of [Plaintiff's] automobile, * * * was due to failure of the manufacturer of the dimmer switch to use ordinary care in the manufacture thereof? * * *
 "Answer: It was."

5. "Question No. 4:
 "Do you find * * * that * * * Ford * * *, by the exercise of ordinary care in making an inspection * * * could have discovered the inherently dan-

gerous condition of the [Plaintiff's] automobile * * *? * * *
 "Answer: They could not have."

6. "Question No. 7:
 "Do you find * * * that [Ford] was negligent in placing on the market the [Plaintiff's] automobile in the condition it was in at the time it was put on the market? * * *
 "Answer: It was."

7. Defensive interrogatories inquiring into contributory negligence, failure of Plaintiff to keep a proper lookout, etc. were all answered favorably to Plaintiff.

8. In the context of the whole charge, there was no error in the Court's instruction here that " * * * Ford Motor Company, just like all manufacturers, in selling its products, is liable for negligence in the manufacture of any of the component parts of the final product, whether the component part was actually manufactured by it or someone else.

S.W.2d 646, 649. The Court thus expressly cited and adopted the Restatement, Torts § 400 (1934) which provides:

"One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." [9]

■ To hold the assembler liable for the negligence of its component-part manufacturer appears to be a sound and realistic doctrine.[10] Reminiscent of the law merchant which developed out of the needs and practices of the business community, this principle surely reflects the outlook of this modern world of big business advertising in a big way. Without faintly suggesting even a remote whisper of a possbility that we are now subconsciously lapsing into notions of *express* warranties, the law ought to be able to reckon with the forces to which its votaries are daily exposed, at least off the bench or out of chambers. As the New York Court of Appeals has recently characterized it, "The world of merchandising is, in brief, no longer a world of direct contract; it is, rather, a world of advertising * * *," Randy Knitwear, Inc. v. American Cyanamid, Inc., 1962, 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E. 2d 399. The business of the manufacture, distribution and sale of automobiles is at the core of our national economy. Dinned into the heads of those who either now are or will someday be potential customers is the intense propaganda in newspaper, magazine, radio and television advertising to buy the named brand.

It owes the duty to the public of exercising ordinary care to see that the products it sells are in such condition that they will function properly, if put to ordinary use in the ordinary manner." See Boeing Airplane Co. v. Brown, 9 Cir., 1961, 291 F.2d 310.

9. The 1948 revision to Comment *c* states that the assembler is under a duty to exercise care "to secure the adoption of a proper formula or plan and the use of safe materials and to inspect the chattel when made. But he does not escape liability by so doing. He is liable if, because of some negligence in its fabrication or through lack of proper inspection during the process of manufacture, the article is in a dangerously defective condition which the [assembler] could not discover after it was delivered to him." Restatement, Torts § 400, Comment c (1948 Supp.).

As defined in Comment *d*, the assembler who comes under the scope of § 400 is one who "puts out the chattel as his own product. The [assembler] puts out a chattel as his own product in two types of cases. The first is where the [assembler] appears to be the manufacturer of the chattel. The second is where the chattel appears to have been made particularly for the [assembler]. In the first type of case the [assembler] frequently causes the chattel to be used in reliance upon his care in making it; in the second, he frequently causes the chattel to be used in reliance upon a belief that he has required it to be made properly for him and that the [assembler's]

reputation is an assurance to the user of the quality of the product. * * * Thus, one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trade-mark. * * *." Restatement, Torts § 400, Comment *d* (1948 Supp.).

This seems to be the law in other states as well as in Texas. E. g., Dow v. Holly Mfg. Co., 49 Cal.2d 720, 321 P.2d 736; Dow Drug Co. v. Nieman, 1936, 57 Ohio App. 190, 13 N.E.2d 130; Rulane Gas Co. v. Montgomery Ward & Co., 1949, 231 N.C. 270, 56 S.E.2d 689; Thornhill v. Carpenter-Morton Co., 1915, 220 Mass. 593, 108 N.E. 474; Chapman Chemical Co. v. Taylor, 1949, 215 Ark. 630, 222 S.W.2d 820.

10. "[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." Escola v. Coca Cola Bottling Co., 1944, 24 Cal.2d 453, 150 P.2d 436 (special concurrence).

Though many have emphasized how lonely is the position of Justice Traynor in his solo concurrence, Texas would not shy away from him for speaking in high terms of "public policy." As we pointed out in Gladiola Biscuit Co. v. Southern Ice Co., 5 Cir., 1959, 267 F.2d 138, 139, the Texas Supreme Court has made its choice, not in the legalisms of warranty, but by speaking not less than a dozen times in frank terms of public policy. Bowman Biscuit Co. of Texas v. Hines, 1952, 151 Tex. 370, 251 S.W.2d 153.

274

Though discerning industrialists or students of our economy should know that in each car as it rolls off the assembly line there is represented countless man hours of labor by workers scattered throughout hundreds of plants independently owned and operated, not even these sophisticated "men of distinction" would suppose that they were bargaining for a mobile assortment of nuts, bolts and moving parts which if well greased, coaxed and fueled would act like an automobile. The purchaser of a new automobile is led by the manufacturer-assembler to think that the car is a quality product. In effect, the purchaser does not distinguish between the assembler and the manufacturer. Nor does the manufacturer-assembler wish him to do so. Although he may realize that the assembler actually does not design and manufacture every component part, the purchaser assumes that the manufacturer-assembler will procure non-defective parts from reputable firms without the ultimate customer having to ascertain the manufacturer of each part. See 2 Harper & James, Torts § 28.28 (1956); 1 Frumer & Friedman, Products Liability § 10.02 (1961). Indeed, it is just such developments which led to the 1948 changes in Comment *d*, as well as *c*, to § 400. See note 9, supra.

 Once it is recognized that the principles of § 400 apply, this brings into play other principles expressly incorporated into § 400. Thus, the assembler bears the liability of his manufacturer-supplier. And a manufacturer is, of course, liable to those within the foreseeable zone of danger for harm caused by the failure to exercise reasonable care in the manufacture of a chattel which, when, defectively made will likely produce substantial bodily harm. See especially § 395. It is thus obvious that the Restatement contemplates holding the manufacturer (and the assembler by virtue of § 400) liable for negligent manufacture over and beyond the scope of the assembler's duties as to inspection. To this Texas adds its approval by the statement from S. Blickman, Inc. v. Chilton, supra, that "[a] manufacturer who places in trade and commerce a manufactured article not inherently, but, because of its condition, imminently, dangerous to life and limb, is liable to one who sustains injury by reason of such condition." 114 S.W.2d 646, 649.

 Ford here asserts that an automobile is not an inherently dangerous instrumentality and thus the Court erred in submitting this to the jury. The Court charged in effect that an automobile having a defect "calculated to cause an unreasonable risk or injury to those lawfully using such automobile for the purpose for which it was intended" would be inherently dangerous. Though there is now considerable reason for concluding that to cast it in the mold of "inherently dangerous" is a worn out, needless, vestigial theory for overcoming the lack of privity in a tort case,[11] submission worked in Ford's favor and no complaint may be made by it. So long as applicable, we regard the statement as correct. In doing so, we reject, as have many courts,[12] the earlier classification that inherently dangerous articles only include such items as poisons, dynamite, deadly weapons, etc. A brand new

11. Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1102 (1960); Keeton, Products Liability—Current Developments, 40 Texas L.Rev. 193 (1961); James, Products Liability, 34 Texas L. Rev. 44, 52 (1955).

12. Cf., Hoenig v. Central Stamping Co., 1936, 273 N.Y. 485, 6 N.E.2d 415; DeLape v. Liggett & Meyers Tobacco Co., D.C.Cal., 1939, 25 F.Supp. 1006, aff'd, 9 Cir., 1940, 109 F.2d 598; Smith v. S. S. Kresge Co., 8 Cir., 1935, 79 F.2d 361; White Sewing Machine Co. v. Feisel, 1927, 28 Ohio App. 152, 162 N.E. 633; Carter v. Yardley & Co., 1946, 319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559; La Frumento v. Kotex Co., 1928, 131 Misc. 314, 226 N.Y.S. 750; Kalash v. Los Angeles Ladder Co., 1934, 1 Cal.2d 229, 34 P.2d 481; Heckel v. Ford Motor Co., 1925, 101 N.J.L. 385, 128 A. 242, 39 A.L.R. 989; Coakley v. Prentiss-Wabers Stove Co., 1923, 182 Wis. 94, 195 N.W. 388.

automobile bearing down a highway in the dark of night with a dimmer switch so defective as to plunge the driver in total, sudden, unpredicted darkness is indeed "dangerous" both to those in it and those within its range. On all tests it is "dangerous" and the risk of injury is an unreasonable one. A manufacturer or assembler who produces such an article as a result of negligent manufacture and sells it to one clearly within the range of persons expected to use it owes a legal duty to such person to use reasonable care to prevent injury to him.[13] This duty is not created by contract, but arises from the general duty not to injure another through disregard for his safety. The standard of reasonable care is commensurate with the risk of danger involved should there be a defective product. See 1 Hursh, Products Liability § 2:5 (1961).

Ford makes the additional contention that Plaintiff is precluded from recovery because he is not in "privity" with Ford. While it may be true that Plaintiff is not in privity with Ford, we do not regard the Texas courts as requiring privity in this situation. The Supreme Court of Texas has said that privity "applies only when one is seeking to enforce a contract." Jacob E. Decker & Sons v. Capps, 1942, 139 Tex. 609, 164 S.W.2d 828, 831, 142 A.L.R. 1479. That case involved a suit by an injured plaintiff against the manufacturer of a defective food product. The same rule has been applied as to retailers of food products, Griggs Canning Co. v. Josey, 1942, 139 Tex. 623, 164 S.W.2d 835, 142 A.L.R. 1424, though not as to wholesalers, Bowman Biscuit Co. of Texas v. Hines, 1952, 151 Tex. 370, 251 S.W.2d 153; cf. Gladiola Biscuit Co. v. Southern Ice Co., 5 Cir., 1959, 267 F.2d 138. The Texas courts, as do most other courts, undoubtedly regarding food and drug cases as exceptional, dispense with any requirement of privity.[14] The category is constantly expanding to encompass cosmetics, soaps, deodorants, clothing, and similar products within the area of strict liability. See Henningsen v. Bloomfield Motors, Inc., 1960, 32 N.J. 358, 161 A.2d 69, 83, 75 A.L.R.2d 1, 39 Texas L.Rev. 697 (1961); Lartigue v. R. J. Reynolds Tobacco Co., 5 Cir., 1963, 317 F.2d 19, 25, note 6, discussing the new Restatement, Torts Second § 402A. How far Texas will go,[15] or perhaps more cor-

13. International Derrick & Equipment Co. v. Croix, 5 Cir., 1957, 241 F.2d 216, cert. denied, 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428; Johnson v. Murray Co., Tex.Civ.App., 1936, 90 S.W.2d 920; Roosth & Genecov Production Co. v. White, 1953, 152 Tex. 619, 262 S.W.2d 99.

14. E. g., Athens Canning Co. v. Ballard, Tex.Civ.App., 1963, 365 S.W.2d 369; Charles Pfizer & Co. v. Branch, Tex. Civ.App., 1963, 365 S.W.2d 832; Coca-Cola Bottling Co. of Fort Worth v. Smith, Tex.Civ.App., 1936, 97 S.W.2d 761; Brown Cracker & Candy Co. v. Jensen, Tex.Civ.App., 1930, 32 S.W.2d 227; Dunn v. Texas Coca-Cola Bottling Co., Tex. Civ.App., 1935, 84 S.W.2d 545; Jax Beer Co. v. Schaeffer, Tex.Civ.App., 1943, 173 S.W.2d 285, error ref'd, w. m.; Campbell Soup Co. v. Ryan, Tex.Civ.App., 1959, 328 S.W.2d 821; Manzoni v. Detroit Coca-Cola Bottling Co., 1961, 363 Mich. 235, 109 N.W.2d 918; Davis v. Van Camp Packing Co., 1920, 189 Iowa 775, 176 N.W. 382, 17 A.L.R. 649; and cases cited in Jacob E. Decker & Sons v. Capps, 1942, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479.

15. Courts are on the go, but whether too far, too fast depends on the point of view. Privity even in so-called tort "warranty" situations is becoming less important, and negligence is frequently supplanted by some form of strict liability. See, e. g., Henningsen v. Bloomfield Motors, Inc., 1960, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1; Welter v. Bowman Dairy Co., 1943, 318 Ill.App. 305, 47 N.E.2d 739; Bahlman v. Hudson Motor Car Co., 1939, 290 Mich. 683, 288 N.W. 309; Worley v. Proctor & Gamble Mfg. Co., 1953, 241 Mo.App. 1114, 253 S.W.2d 532; Hamon v. Digliani, 1961, 148 Conn. 710, 174 A.2d 294; State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc., 1961, Iowa, 110 N.W. 449; this may include situations of an assembler's liability for injuries resulting from defectively manufactured component parts. Courtois v. General Motors Corp., 1962, 37 N.J. 525, 182 A.2d 545, 554.

Writing in 1960 Prosser pointed to a "trend" from seven recent cases impos-

rectly, how fast it will go is something we should leave to another day and, we hope, another court. But approaching it as does the Supreme Court of Texas on the straight forward plane of public policy in protecting what it conceives to be precious Texas lives, we cannot believe that it will differentiate between a Texan felled by a microbe and one killed by a negligently defective machine hurtling through space at great, but expected, speed. Whatever distinctions are maintained [16] in substantive standards of strict rather than negligence liability because of the relative sureness of identifying the manufacturer with the harmful consequence and the harm causing qual-

ity of the product, none will exist as to privity. If privity is not needed for one, it will not be required for the other.[17]

On the basic issue, Texas law holds the manufacturer-assembler liable for the negligence of its supplier of a component part. The evidence and findings, express and implied, F.R.Civ.P. 49 (a) are adequate to sustain the judgment and the trial was free of any significant error.[18]

That is the end of it.

Affirmed.

CAMERON, Circuit Judge, dissents.

---

ing strict liability for injuries resulting from non-food products, such as: Spence v. Three Rivers Builders & Masonry Supply, Inc., 1958, 353 Mich. 120, 90 N.W.2d 873 (cinder building blocks); Continental Copper & Steel Industries v. E. C. "Red" Cornelius, Inc., Fla.App., 1958, 104 So.2d 40 (electric cable); B. F. Goodrich Co. v. Hammond, 10 Cir., 1959, 269 F.2d 501 (automobile tire). Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1112 (1960).

This approach is also followed by Federal Courts applying state law. B. F. Goodrich Co. v. Hammond, 10 Cir., 1959, 269 F.2d 501; Arnaud's Restaurant, Inc. v. Cotter, 5 Cir., 1954, 212 F.2d 883; Bowles v. Zimmer Mfg. Co., 7 Cir., 1960, 277 F.2d 868, 76 A.L.R.2d 120; Chapman v. Brown, D.C.Hawaii, 1961, 198 F. Supp. 78; McQuaide v. Brideport Brass Co., D.C.Conn., 1960, 190 F.Supp. 252; Taylerson v. American Airlines, Inc., S.D.N.Y., 1960, 183 F.Supp. 882; Hinton v. Republic Aviation Corp., S.D.N.Y., 1959, 180 F.Supp. 31.

16. See, e. g., what Prosser, p. 1138, note 15, supra, describes as " * * * an astonishing little argument" over strict liability for food but not its container, a " * * * metaphysical distinction" which "can only be regarded as amazing"; and citing Texas cases. See also Hankins v. Coca Cola Bottling Co., 1952, 151 Tex. 303, 249 S.W.2d 1008.

17. Cf. Strakos v. Gehring, 1962, Tex., 360 S.W.2d 787. And see: Keeton, Products

Liability—Current Developments, 40 Texas L.Rev. 193 (1961); Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960); Liggett & Meyers Tobacco Co. v. Wallace, Tex.Civ.App., 1934, 69 S.W.2d 857, error dism'd; Johnson v. Murray Co., Tex.Civ.App., 1936, 90 S.W.2d 920, error dism'd; S. Blickman, Inc. v. Chilton, Tex.Civ.App., 1938, 114 S.W.2d 646; International Derrick & Equip. Co. v. Croix, 5 Cir., 1957, 241 F.2d 216, cert. denied, 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428.

18. Of the 35 specified errors we need mention but a few. The evidence and form of jury submission on damages present no error. Nor was there error in excluding the hearsay report of the highway patrolman. The charge as a whole was not deficient for refusing the requested instructions. As to the findings that Ford was negligent in selling the automobile nothing is presented since we hold negligence of the supplier was imputed to it. No more is needed. Though no error is discussed in such terms, we also hold in order to eliminate doubt that the evidence was sufficient to warrant the finding that the defect was caused by the negligence of the supplier. See Otis Elevator Co. v. Robinson, 5 Cir., 1961, 287 F.2d 62; Dement v. Olin-Mathieson Chemical Corp., 5 Cir., 1960, 282 F.2d 76; Ozark v. Wichita Manor, Inc., 5 Cir., 1957, 252 F.2d 671, 258 F.2d 805; Keeton, Products Liability—Proof of Manufacturer's Negligence, 49 Va.L.Rev. 675 (1963).